Rebecca SCHUTTERLE, Plaintiff and Respondent,

v.

Edna SCHUTTERLE, Individually and as the Administratrix of the Estate of Ralph Schutterle, Deceased, Defendant and Appellant.

No. 11890.

Supreme Court of South Dakota.

Nov. 17, 1977.

Orville W. Robbins of Robbins & Von Wald, Selby, for plaintiff and respondent.

Robert C. Riter and Robert C. Riter, Jr. of Riter, Mayer, Hofer & Riter, Pierre, for defendant and appellant.

WOLLMAN, Justice.

This is an appeal from a judgment that decreed the specific performance of an antenuptial agreement and quieted title to certain real estate located in Potter County, South Dakota. We affirm.

Ralph and Marie Schutterle farmed 1280 acres of land northwest of Gettysburg, South Dakota. One child, Larry, was born of their marriage. In November of 1959, Ralph underwent surgery that impaired his ability to operate his farm. Larry, an engineering graduate of the South Dakota School of Mines and Technology, was working at the time as an engineer in the bridge division of the South Dakota State Highway Department in Pierre. Late in 1959, Ralph and Marie came to the home of Larry and his wife, Rosella, in Ft. Pierre, South Dakota. Ralph told Larry and Rosella that if they would come back and operate the farm it would be his intention to leave the farm to them. Larry and Rosella decided to accept Ralph's offer, and in the spring of 1960 they moved to the farm, which Larry operated until his death at the age of 31 in July of 1965. Larry left one child, Rebecca (hereinafter referred to as Rebecca or respondent), who is the plaintiff in this action.

Marie Schutterle died in September of 1962. Following her death, Ralph spent some time during the winter months of the following years visiting relatives in Iowa. On March 14, 1964, he returned to the Gettysburg farm from his yearly visit to Iowa and told Larry and Rosella that he intended to marry a woman whom he had met during his stay there. He stated that he did not expect that his marriage would make any difference with respect to the agreement that he had with Larry and Rosella concerning the farm, that as long as they remained on the farm it would be theirs upon his death, and that he and his wife-to-be would enter into an agreement whereby their respective property would remain theirs and would ultimately go to their respective children. Several days later Ralph mentioned to Larry and Rosella that prior to his forthcoming marriage he would have a contract drawn up that would carry out his intentions regarding his property.

Edna Engelsen (hereinafter referred to as Edna or appellant), grew up as an orphan in Iowa. She completed the eighth grade of school, and at age 17 she married a man some ten years her senior. The marriage ended in divorce a year later and Edna thereafter supported herself by working as a waitress and as a sales clerk. In 1941 she married Delbert Miller. A year later she and her husband purchased an 80-acre dairy farm near Norway, Iowa. Edna assisted her husband in managing and operating the farm. Two children, both of whom were in their thirties at the time this action was tried in April of 1975, were born to the marriage. Delbert Miller died in

July of 1962. Edna succeeded to the ownership of the farm through her survivorship rights as a joint tenant and continued to operate the farm until January of 1963, when she sold the livestock and machinery at auction. She then rented out the land through her own efforts and thereafter collected the rent and paid the taxes.

Edna and Ralph met in January of 1963 and thereafter began seeing each other regularly. Ralph soon proposed marriage and in October of 1963 the two decided to marry. At that time Edna owned the 80-acre farm, from which she was receiving some $2,100 per year in rental income, an automobile and other personal property. The probate inventory that was filed with respect to Delbert Miller's estate in August of 1962 listed personal property of a value of approximately $11,000, together with the land, for a total estimated net estate value of some $36,000.

During the time that they were seeing each other, Edna learned that Ralph owned a grain and livestock farm in South Dakota that was being operated by his son, who was living on the farm with his wife and daughter. Edna knew that Ralph went back to South Dakota and helped his son during the crop season. Ralph told her that he "wasn't a poor man and wasn't a rich man." Belmont Schutterle, one of Ralph's Iowa cousins, testified that he had had a conversation with Edna sometime in 1963 during which Edna referred to a story that was going around the community that she was running after Ralph for his money and then went on to say, in Belmont's words,

"   .   .   .   [S]he said I don't know if Ralph will ever marry me or not, but she said if he does before he ever marries me what is Ralph's is Ralph's and what is mine is mine and she said that's going to be put in black and white   .   .   ."

Edna herself testified that she did not need to get married for support, that she was interested in Ralph and not in what he had, and that she would have married him had he been a poor man.

After deciding to marry, Ralph and Edna agreed that they would live on Edna's Iowa farm. The marriage itself was to take place in South Dakota on March 18, 1964. As we have indicated above, Ralph returned to the Gettysburg farm on March 14, 1964. Edna and her daughter arrived at Gettysburg on March 17, 1964. Sometime during the early afternoon of March 18, 1964, Ralph and Edna went to the office of attorney Coe Frankhauser in Gettysburg. Mr. Frankhauser had prepared Ralph's income tax returns over the years and had handled the termination of life estate proceedings after Marie Schutterle's death.

After introducing Edna as his fiancee, Ralph explained that they wanted "some kind of paper so that what is mine is mine and what is Edna's is Edna's and so our kids will get it." Mr. Frankhauser prepared to make a list of the assets owned by each and began asking about personal property items, whereupon Ralph stated that they would take care of the personal property themselves and just wanted the land included in the agreement. Neither Ralph nor Edna was able to give a legal description of the real property owned by each. Mr. Frankhauser learned that Edna owned an 80-acre farm in Iowa. Ralph described his real estate as "all the land I have got out here." The couple indicated that the reason they were trying to keep the land separate was so that it would go to their respective children. After getting the names and addresses of Edna's children, Mr. Frankhauser informed the couple that he would have the agreement ready for their signatures later that afternoon, they having indicated that they wanted it promptly.

Later that afternoon Ralph and Edna returned to the office. Mr. Frankhauser gave them two copies of the agreement and asked them to read it. After they had examined the agreement for a time, Ralph and Edna indicated in response to Mr. Frankhauser's inquiry that the written document represented what they had in mind and that they had no questions regarding the agreement.

They then signed and acknowledged the agreement before Mr. Frankhauser.[1] He handed the original and one copy of the agreement to the couple. After leaving Mr. Frankhauser's office, Ralph and Edna returned to Ralph's home and were married later that evening. Ralph was then 59 years of age and Edna 47 or 48. The original copy of the agreement was placed in Ralph's safe deposit box in a Gettysburg bank, where it remained until his death.[2]

1.  Mr. Frankhauser did not tell Edna that under the intestate laws of South Dakota she would be entitled to one-half of Ralph's estate, nor, apparently, did he tell her that Ralph could leave his entire estate to Larry if he so desired. SDCL 29–3–7; *In re Vetter's Estate*, 75 S.D. 417, 66 N.W.2d 519.

2.  The pertinent parts of the agreement read as follows:

"ANTENUPTIAL SETTLEMENT CONTRACT

This Antenuptial Settlement Contract made and entered into at the City of Gettysburg, Potter County, South Dakota, this 18th day of March, 1964, between Ralph Schutterle of Gettysburg, South Dakota, hereinafter for convenience referred to as the husband, and Edna Miller of Norway, Benton County, Iowa, hereinafter referred to as the wife, WITNESSETH:

I.

WHEREAS, marriage is intended to be solemnized between the parties soon after the execution of the Antenuptial Settlement Contract; and,

II.

WHEREAS, the parties hereto each have issue living by a previous marriage, namely Ralph Schutterle, husband, is survived by an adult son, Larry R. Schutterle of Gettysburg, South Dakota, and Edna Miller is survived by an adult son, Douglas Miller, now of Cedar Rapids, Iowa, and by a daughter, Karen Miller, now of Norway, Iowa; and,

III.

WHEREAS, the parties hereto each have certain solely owned real property which they desire to keep separate as their sole and separate estate and to leave to their respective children, born as the issue of their respective previous marriages, or to the survivors of such issue, or to dispose of such real property to other persons, firms, or organizations, either during their lifetime or at death, the same as if each were separate and unmarried, and that the real property owned by the husband at the date of this Antenuptial Settlement Agreement is situated within Potter County, State of South Dakota, and consists of all his farm and grass lands, both improved and unimproved, and the wife's real property consists of an eighty (80) acre farm situated in Lennox Township, Iowa County, Iowa,

IV.

NOW, THEREFORE, in the consideration of their mutual promises and the performance thereof, and their contemplated marriage, the parties hereto agree as follows:

V.

That the real property which the wife now holds, owns, and possesses shall remain forever her personal estate, together with the right to hold and possess the same as if she were sole and unmarried, and the real property which the husband now holds, owns, controls and possesses, shall remain forever his personal estate together with the right to hold and possess the same as if he were to remain sole and unmarried, and each of the parties hereto agrees to make no claim to the separate real property of the other, either during the joint lives of the parties hereto, or thereafter, and each of the parties shall be free to dispose of his or her real property by deed, transfer, or testamentary devise without consent of the other, to all intents and purposes as if no such relation, as that of marriage between them existed, and that this agreement shall extend to the proceeds resulting from the sale or transfer of any such real property, owned by the parties hereto, at the date of this Antenuptial Contract, or any increase in value thereto, and any improvements made upon the real estate of either of the parties, shall be considered as part of the real property and all improvements made shall be the property of each individual owner without claim of the other party, and that this Antenuptial Contract shall be construed as a waiver of all homestead rights in the real property owned by the other party at the date of this Antenuptial Contract, and shall be a bar to the rights of the other party, in the real property in event that the marriage shall be dissolved by divorce.

VI.

Nothing herein shall be construed to bar to [sic] either party to this agreement from voluntarily giving any property which either may possess to the other party by testamentary devise or otherwise, but neither of the parties shall be so required.

VII.

That each party agrees to sign all title papers, deeds, or instruments necessary to transfer property being sold to a purchaser by the other party if such purchaser, as a condition of sale shall require execution by the spouse of the seller.

VIII.

It is mutually agreed and understood that each of the parties hereto, may for the purposes of carrying out the intent and purpose of this Antenuptial Settlement Contract make deeds, transfers, and testamentary devises for the purposes of providing for the transfer of their separate real property without any consent of the other spouse or claim, of the other party."

Ralph and Edna returned to Iowa following the wedding, where they lived on Edna's farm until Larry Schutterle's death the following year. They then returned to South Dakota. Ralph operated the farm for several years and then rented it out. The couple filed joint tax returns and Edna saw copies of property tax assessment records and tax receipts. The couple maintained a joint checking account. Income realized from the South Dakota farm was used to purchase jointly owned savings certificates. Edna used some of the income she realized from her Iowa farm to put her daughter through college and deposited the remainder in her solely held bank account in a Gettysburg bank. Edna learned during the marriage that Ralph owned, in her words, "a lot of land"; she also saw his cattle and the farm machinery. She knew that he had two savings accounts in a Pierre bank and was aware of how much cash he carried in the checking account in the Gettysburg bank. She was aware that the antenuptial agreement was in Ralph's safe deposit box, and she acknowledged she could have looked at it had she wanted to.

In April of 1971, Ralph and Edna went to the office of attorney Harold W. Swift at Marengo, Iowa, for the purpose of obtaining a contract for the sale of Edna's Iowa farm. According to Mr. Swift's testimony, Edna came into his private office alone while Ralph remained in the reception room. Edna explained the terms of the contract and stated that Ralph had nothing to do with the contract and that there was a reason for this. After Mr. Swift apparently expressed some question regarding Ralph's interest in the land, Ralph came into the office and explained that there was an agreement between the two which provided that he had no interest in Edna's real estate and she had none in his. Edna agreed that that was correct. Mr. Swift ultimately prepared a real estate contract for the sale of the Iowa property for a total price of $64,000. The agreement provided in part that:

"IT IS AGREED this _____ day of April, 1971, by and between Edna A. Schutterle (formerly the wife of Delbert H. Miller, deceased); her present husband, Ralph Schutterle does not join in this contract because he has no interest in the property of his wife by virtue of a prenuptial agreement

\* \* \* \* \* \*

Ralph Schutterle, husband of Edna A. Schutterle, joins in this contract for the sole purpose of releasing any interest as spouse of Edna Schutterle and agrees to join in the execution of deed on the completion of contract . . ."

Edna later signed and acknowledged this instrument in Mr. Swift's presence.

Ralph Schutterle died on May 31, 1972. After discussing with Mr. Frankhauser the circumstances surrounding the execution of the antenuptial agreement, the attorneys who were representing Edna in her capacity as administratrix of Ralph's estate (who are not her attorneys in the instant action) decided to proceed with the administration of the estate as though the agreement were void.

In September of 1972, Rosella Horner (she having remarried following Larry's death) filed a petition for admission to probate of a will executed by Ralph on December 11, 1962, under the terms of which Rebecca would succeed to the entire estate. In December of 1972, a judgment was entered by the district county court refusing to admit the December 1962 will to probate. On February 7, 1973, the district county court entered a decree setting apart 160 acres of Ralph's real property as Edna's homestead. No objection was made to the entry of this order.

In July of 1973, Rosella Horner, acting as the guardian of Rebecca Schutterle's estate, commenced the instant action to quiet title to the real property owned by Ralph at the time of his death and to secure specific performance of the antenuptial agreement.[3]

---

3. Rebecca Schutterle attained the age of majority during the pendency of the proceedings in the circuit court and was substituted as party plaintiff in her own name.

Attorney Swift testified that in the fall of 1974 he received a telephone call from Edna during which she stated that she wanted to change the 1971 real estate contract for the sale of the Iowa land by striking out the language we have quoted above. Mr. Swift advised her that it would not be possible to do that. In December of 1974, Edna, accompanied by her sister, came to Mr. Swift's office in Marengo. Edna asked about the above-quoted language and stated that she had not told Mr. Swift to include it in the contract. He replied that that was not his recollection and that he would not have included the language had she not instructed him to do so.

The trial court found that at the time Ralph and Edna agreed to marry the aggregate value of Ralph's property, including the 1280 acres of real estate, was between $110,000 and $125,000, and that the aggregate value of Edna's real and personal property was between $40,000 and $50,000. The court further found that Edna had acquired a comprehensive knowledge of the extent and value of Ralph's property by the time she sold her Iowa farm in April of 1971. The court concluded that by selling the Iowa farm in reliance upon the antenuptial agreement, Edna had ratified the agreement and was therefore estopped from denying its validity.

On appeal Edna contends (1) that the trial court erred in holding the antenuptial agreement valid, (2) that she is not estopped from denying the validity of the agreement, (3) that the testimony of attorney Swift was inadmissible under the attorney-client privilege, (4) that the written agreement superseded any contemporaneous oral agreement that she and Ralph may have had regarding their proposed ownership of their personal property, and (5) that she is entitled to homestead rights in Ralph's land.

Appellant's version of many of the events recounted above was contrary to the facts as found by the trial court. For example, she denied having read the antenuptial agreement before signing it; she testified that on the trip to Mr. Frankhauser's offices Ralph had become highly emotional and had begged her to promise not to leave him (Frankhauser testified that Ralph was in a good humor when he introduced Edna to Mr. Frankhauser and his secretary). Again, Edna denied that she had had any conversation with attorney Swift concerning the above-quoted language in the Iowa sales contract and testified that she did not know how those provisions had gotten into the contract. She also denied having read the contract before she signed it.

■ It was for the trial court to weigh appellant's testimony on these and other areas of disputed fact and to determine the credibility of her testimony and that of the other witnesses. " . . . [T]he credibility of the witnesses and weight to be accorded their testimony is for the trial court and we accept that version of the evidence including any reasonable inferences therefrom which are favorable to the trial court's determination." *Larson v. Syverson*, 84 S.D. 31, 33, 166 N.W.2d 424, 425. Our review on appeal of findings of fact is governed by SDCL 15-6-52(a), which directs us to give due regard to the opportunity of the trial court to judge the credibility of the witnesses and provides that findings of fact shall not be set aside unless clearly erroneous. The question for us on appeal is not whether we would have made the same findings as the trial court did, but whether after reviewing the entire evidence we are left with a definite and firm conviction that the trial court was mistaken in making the challenged findings. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455. Applying these principles to the facts at hand, we conclude that the trial court's findings with respect to the evidence we have summarized above are not clearly erroneous.

■ We start with the proposition that antenuptial agreements are favored in law since they allow parties to protect the inheritance rights of their respective children by prior marriages and thus prevent subsequent strife over the disposition of their respective estates. See, e. g., *In re Estate of Jeurissen*, 281 Minn. 240, 161 N.W.2d

324; *In re Estate of Strickland*, 181 Neb. 478, 149 N.W.2d 344; *In re Koeffler's Estate*, 215 Wis. 115, 254 N.W. 363; 41 Am. Jur.2d Husband and Wife, § 283; 41 C.J.S. Husband and Wife § 77.

Moreover, courts have recognized that it is natural and proper for a parent to desire to provide for the children of his or her first marriage. See, e. g., *Christians v. Christians*, 241 Iowa 1017, 44 N.W.2d 431; *In re Estate of Jeurissen*, supra; *In re Beat's Estate*, 25 Wis.2d 315, 130 N.W.2d 739 (postnuptial agreement).

■ Because so much depends upon the circumstances peculiar to the parties, factors such as the respective age of the parties, their prior marital status, the number and ages of children from prior marriages, the nature and extent of the property owned by the parties, and other factors affecting the status of the parties to the prospective marriage, it is a statement common to decisions involving the validity of antenuptial agreements that each case depends upon its own facts. See, e. g., *In re Estate of Strickland*, supra; *In re Beat's Estate*, supra.

■ Some courts appear to have established a hard and fast rule that there must have been a full and frank disclosure by the prospective husband to his prospective wife concerning the nature and extent of his property before an antenuptial agreement will be held to be valid and binding as against the wife, see generally Annot. 27 A.L.R.2d 883. We conclude, however, that the better rule is that under which an antenuptial agreement will be held valid if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the prospective spouse, or if the prospective spouse has been adequately provided for by the agreement. See, e. g., *Del Vecchio v. Del Vecchio*, Fla., 143 So.2d 17; *Watson v. Watson*, 5 Ill.2d 526, 126 N.E.2d 220; *In re Estate of Hillegass*, 431 Pa. 144, 244 A.2d 672; *In re Borton's Estate*, Wyo., 393 P.2d 808.

The trial court found that although Ralph had made no disclosure to Edna of the exact extent and value of his estate prior to their marriage, Edna had learned during their courtship that Ralph owned land, livestock and farm machinery in South Dakota. The court also found that Edna was not interested in learning the extent and value of Ralph's estate prior to their marriage; that she did not need to marry for support; and that she had married Ralph because she wanted companionship and a home. Appellant's own testimony amply supports this finding by the trial court. Appellant testified that she knew that Ralph returned to Potter County to assist his son during the crop season, something he would hardly have done had the farming operation been carried on on a tract the size of appellant's Iowa farm.

■ Appellant argues that because the same confidential relationship exists between parties to an antenuptial agreement as exists with respect to property transactions between a husband and wife, SDCL 25–2–10, the agreement in question must be subjected to the same scrutiny that this court held was applicable to a postnuptial agreement, namely, that "Transactions of this character are scrutinized by the courts with great care, to the end that no unjust advantage may be obtained by one over the other by means of any oppression, deception, or fraud." *Keith v. Keith*, 37 S.D. 132, 133, 156 N.W. 910, 911.

It is true that it appears to be the majority rule that a confidential relationship does exist between the parties to an antenuptial agreement, see, e. g., *Del Vecchio v. Del Vecchio; Watson v. Watson; In re Estate of Strickland; In re Estate of Hillegass*, all supra. Contra, *In re Marriage of Dawley*, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323. Even if we apply the standard of strict scrutiny, however, there is not a hint in the record that Ralph was guilty of any concealment concerning the nature and extent of his South Dakota property or that he exercised any undue influence upon appellant. Rather, Ralph's desire to protect

the inheritance rights of his son in return for Larry's faithful service in operating the family farm after Ralph's illness is the mark of a parent who is concerned with rewarding such fidelity and not the badge of one who seeks to disinherit his prospective wife out of base or selfish motives. It is an ungrateful, callous son indeed who would not feel some obligation to return to the farm and help his father when illness strikes. We can well appreciate the conflicting emotions that Larry must have experienced when he considered exchanging the security and comfort of a professional career with a highly solvent, weather-resistant employer for the economic uncertainties of life on a farm in the semi-arid reaches of north central South Dakota. That Larry had every legitimate right to rely upon his father's assurances that the farm would someday be his is beyond question; that Ralph had every legitimate moral and legal right to honor his commitment to his son is similarly not subject to serious question. That Ralph must have communicated to Edna his intention to retain his real estate as his sole property finds support in Belmont Schutterle's testimony that Edna had told him that if she and Ralph married they would retain their separate property.

We conclude, therefore, that even if the record evidence does not reveal the full, detailed disclosure by Ralph of the exact nature and extent of his property that he undoubtedly would have made had the parties not waited until the last minute to have the necessary agreement drawn that would incorporate their prior understanding with respect to the ownership of their separately owned property, the totality of the circumstances persuades us that appellant had sufficient knowledge of the nature and extent of Ralph's property to satisfy the alternative tests of disclosure or independent knowledge.

With respect to the circumstances surrounding the actual preparation and execution of the agreement, we see nothing sinister or suspicious about the fact that Ralph waited until returning to his home to have the agreement drawn or that he should have turned to the same attorney who had represented him in other legal matters. That clients too often wait until the last minute to have reduced to writing their intentions regarding the inter vivos or testamentary disposition of property is a fact all too familiar to lawyers. In short, we hold that appellant's claim that Ralph was guilty of exercising undue influence over her in securing her assent to the agreement finds no support in the record.

Even if we were to conclude that Ralph's disclosure and appellant's independent knowledge of the nature and extent of Ralph's property were not sufficient to sustain the validity of the agreement, the provision made for Edna by the operation of the terms of the agreement was not so disproportionate to the value of Ralph's total property holdings as to vitiate the agreement. By its own terms the agreement affected only the real estate owned by the parties, leaving intact Edna's rights of inheritance in Ralph's personal property. Although the trial court made no finding regarding the separate values of Ralph's real and personal property on the date the agreement was signed, the court did find that on the date of Ralph's death some eight years later the appraised value of the real estate totaled some $115,000; that the value of the personal property, consisting of farm machinery, cash, and government bonds, passing to Edna by inheritance totaled nearly $26,000; and that the personal property passing to her by right of joint tenancy survivorship, consisting mostly of cash, totaled some $39,000. Moreover, Edna retained her full rights as sole owner of the Iowa farm, which had a market value of $64,000 in 1971. Granted that these were not the values as of the date of the agreement, we think that, allowing for the inflationary increases that occurred during the eight-year duration of the marriage, the value of that which Edna was entitled to and did receive under the terms of the agreement was not so disproportionate to the value of Ralph's total property holdings as to constitute a badge of fraud or overreaching by Ralph.

In our view of the effect of the written agreement, it is immaterial that the parties may have entered into a contemporaneous agreement that Edna should share in the proceeds realized from Ralph's farmland, for respondent makes no claim that she is entitled to any more by virtue of the antenuptial agreement than the right to inherit the land as Ralph's sole heir.

■ Whatever doubts one might have concerning appellant's understanding of the legal effect of the terms of the agreement or her knowledge of the nature and extent of Ralph's property on the date the agreement was signed, then certainly by insisting in April of 1971 that Ralph had no interest in her Iowa farmland and in signing the real estate sales contract containing the above-quoted provisions, and by accepting as a sole owner the proceeds of the sale of the Iowa real estate, appellant ratified the terms of the agreement and will not now be heard to attack it. We need not decide whether appellant's failure to attack the agreement during Ralph's lifetime, notwithstanding her undoubted knowledge of the nature and extent of Ralph's property during that time, would be held to bar her from successfully attacking the agreement following Ralph's death, a factor that other courts have considered highly significant in analogous cases, see, e. g., *In re Estate of Strickland*, supra; *In re Knippel's Estate*, 7 Wis.2d 335, 96 N.W.2d 514; *In re Beat's Estate*, supra, for we conclude that appellant's conduct with respect to the sale of her Iowa real estate is overwhelming evidence of her knowledge and acceptance of the terms of the antenuptial agreement.

SDCL 53-3-5 provides that:

"A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting."

In *Strom v. Buholz*, 73 S.D. 583, 46 N.W.2d 912, this court stated that:

."This statute [SDCL 53-3-5] is a declaration of the equity rule which prevents the party benefited from questioning the validity and effectiveness of a matter or transaction insofar as it imposes a liability or obligation upon him. It precludes one who accepts the benefit from repudiating the accompanying obligations. The rule in effect denies the right to assume inconsistent positions and is based on the principle of election and ratification, . . . ." 73 S.D. at 586, 46 N.W.2d at 914.

In *Henrich v. Newell*, 59 S.D. 372, 240 N.W. 327, the court held that the principles of equity and fair dealing would estop heirs who had received benefits of a postmortem family agreement from later challenging the validity of the agreement, citing the following language from *Dobbs v. Elevator Co.*, 25 S.D. 177, 182, 126 N.W. 250, 252:

"It seems to be generally held that, where one having the right to accept or reject the transaction takes and retains the benefits thereunder, he becomes bound by the transaction and cannot avoid its obligation or effect by taking a position inconsistent therewith. Thus it has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the existence or validity of a contract."

In addition to these general principles of ratification governing contracts and agreements in general, other courts have held that the rule of ratification by acceptance of benefits applies to antenuptial agreements. The Illinois Supreme Court has held that:

"The rule of law governing this point is that the wife, by accepting the provision made for her in the antenuptial contract with knowledge of the facts, ratifies and confirms the contract." *Brown v. Brown*, 329 Ill. 198, 160 N.E. 150, 153.

See also *Watson v. Watson*, supra; *Anderl v. Willsey*, 193 Neb. 698, 229 N.W.2d 46. Appellant's conduct in accepting the benefits of the antenuptial agreement by treating the Iowa farmland as solely hers, she having knowledge of the facts concerning Ralph's property holdings, brings her squarely within this rule.

Appellant contends that the trial court erred in permitting attorney Swift to testify over appellant's claim of the attorney-client privilege. Respondent argues that the communications in question were not privileged because attorney Swift had served as a mere scrivener in preparing the Iowa real estate contract and that in any event appellant had waived the privilege by in effect charging attorney Swift with improper conduct in including the above-quoted language in the contract.

SDCL 19–2–4 provides that:

"An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

Although there is authority for the proposition that the relationship between an attorney and a person for whom he acts merely as a scrivener in preparing a document is not such that clothes their communications with the attorney-client privilege, see, e. g., *O'Neill v. Murray*, 6 Dak. 107, 50 N.W. 619; *England v. England*, 243 Iowa 274, 51 N.W.2d 437; *Olsen v. Olsen*, 236 Iowa 313, 18 N.W.2d 602; *Bolyea v. First Presbyterian Church*, N.D., 196 N.W.2d 149; 81 Am. Jur.2d Witnesses, § 184; 97 C.J.S. Witnesses § 280, we think that the relationship between appellant and attorney Swift was more than that of client and scrivener.

The purpose underlying the attorney-client privilege is to encourage a client to communicate freely with his attorney without fear of disclosure. *State Highway Comm. v. Earl*, 82 S.D. 139, 143 N.W.2d 88. This court stated the scope and purpose of the attorney-client privilege even more broadly in the early case of *Austin, Tomlinson & Webster Mfg. Co. v. Heiser*, 6 S.D. 429, 61 N.W. 445:

"The relation between a client and his attorney is a confidential one, and public policy requires that professional communications between them should be privileged. An attorney cannot be called upon by opposing counsel to disclose his reasons for his management of the case in a particular way, or for his reasons for not taking certain proceedings in the case he is conducting. These are matters between himself and his client only. Every communication which a client makes to his legal adviser for the purpose of professional aid and advice, and the advice that counsel may give in relation thereto, are privileged. The principle upon which this rule is based is that the intercourse between the client and his attorney should be altogether free from the fear on the part of the client that his secrets may be disclosed to the public." 6 S.D. at 438, 61 N.W. at 448.

See also *Relf v. Cameron*, 51 S.D. 554, 215 N.W. 881; *In re Graf's Estate*, N.D., 119 N.W.2d 478; *Boylea v. First Presbyterian Church*, supra.

We have not taken a grudging view towards the other privileges created by our statutes. See *Hogue v. Massa*, 80 S.D. 319, 123 N.W.2d 131; *Schaffer v. Spicer*, 88 S.D. 36, 215 N.W.2d 134; *State v. Jaques*, S.D., 256 N.W.2d 559, and we conclude that the same rule of liberal construction should be applied in favor of the attorney-client privilege created by SDCL 19–2–4.

In this view of the attorney-client relationship, we conclude that whatever the relationship may have been at the outset of the preparation of the Iowa real estate contract, when the discussion turned to the matter of the reason why it was not necessary for Ralph Schutterle to join in the contract the conversation between appellant and Mr. Swift of necessity turned from an exchange of merely factual information to a discussion of the legal effect the antenuptial agreement had on Ralph's interest in the Iowa land, for certainly Mr. Swift, an attorney of some 41 years' experience at the time, could hardly have been expected to draw up an instrument that might later present an obstacle to the ultimate completion of the proposed sale. In completing the contract he fulfilled the traditional function of an attorney to whom a client has come for assistance—he exercised his legal judgment upon the basis of information furnished by the client in a setting of confidentiality and rendered advice in the

way of drafting a document that reflected the exercise of that judgment. See *Austin, Tomlinson & Webster Mfg. Co. v. Heiser,* supra; cf. *Hedges v. Hedges,* 87 S.D. 425, 209 N.W.2d 660. The same relationship existed during the subsequent conversations between appellant and Mr. Swift with regard to striking the above-quoted language from the contract.

Respondent argues that in any event appellant waived the attorney-client privilege by implicitly charging attorney Swift with misconduct in inserting the questioned language in the agreement, citing *Relf v. Cameron,* supra, in which this court recognized the rule that an attorney who is charged with fraud or other improper or unprofessional misconduct may testify to the facts in order to protect himself. See also *Hogue v. Massa,* supra; Annot. 51 A.L. R.2d 521. We conclude, however, that appellant's testimony on adverse examination did not constitute an attack upon Mr. Swift's personal integrity or professional conduct, for although appellant denied that she had instructed Mr. Swift to include the quoted language, she only went so far as to say that to her knowledge Ralph had not asked Mr. Swift to include the provisions in question. Moreover, she went on to testify that she did not know who had put the language into the contract. Accordingly, the rule that permits an attorney to testify concerning otherwise privileged communications in order to defend himself against attack is inapplicable here.

Although we reject respondent's theory of waiver by attack on the attorney's conduct, we are of the opinion, however, that appellant's testimony on adverse examination constituted a waiver of the attorney-client privilege and that therefore Mr. Swift's testimony was properly admitted.

SDCL 19–2–6 provides that:

"If a person offer himself as a witness he thereby waives any privilege he might otherwise claim, which would prevent the examination of his attorney, spiritual adviser, or healing practitioner on the same subject within the meaning of §§ 19–2–2 to 19–2–4, inclusive. If a person once waives such privilege, as to any particular communication, he cannot thereafter claim it."

See *Hogue v. Massa,* supra; *Relf v. Cameron,* supra; *Johnson v. Ebensen,* 38 S.D. 116, 160 N.W. 847.

Appellant argues that because she did not voluntarily offer herself as a witness with respect to the communications with Mr. Swift but rather was compelled to testify on adverse examination, she should not be deemed to have waived the privilege with respect to those communications. Although there is authority to support the view that disclosures made during cross-examination are not considered to constitute a voluntary waiver of the attorney-client privilege, see, e. g., *People v. Kor,* 129 Cal.App.2d 436, 277 P.2d 94; *Harrison v. State,* 276 Md. 122, 345 A.2d 830, and cases cited therein; Annot. 51 A.L.R.2d 521, § 8, we conclude that the better view is that by not claiming the privilege during cross-examination a witness is deemed to have waived it.

"Of course, if the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to the communication so disclosed.

\*   \*   \*   \*   \*   \*

What if the client is asked on cross-examination about the communications with his lawyer, and he responds without asserting his claim of privilege? Is this a waiver? Unless there are some circumstances which show that the client was surprised or misled, it seems that the usual rule that the client's failure to claim the privilege when to his knowledge testimony infringing it is offered, would apply here, and that the decisions treating such testimony on cross-examination as being involuntary and not constituting a waiver are hardly supportable." McCormick, Evidence, § 93, at 194– 95 (2nd Ed. 1972) (footnotes omitted)

In what appears to be the leading case upholding the rule of waiver on cross-examination, the Court of Appeals for the Eighth Circuit stated:

"But this privilege of preventing the disclosure of confidential communications is a personal one. It is not a right effective without claim or assertion. It is a mere privilege, that has no practical existence or effect, unless personally and timely claimed by its possessor. It must be presented and claimed by the owner when the subject-matter of it is first presented. Silence during testimony disclosing the privileged confidential communication, or any substantial part of it, waives the privilege, and the owner of it cannot, after testifying to material facts regarding the privileged communication, have an objection sustained to the testimony of the other parties thereto, or to the transaction, on the ground that it is privileged.

\* \* \* \* \* \*

The owner of the privilege of preventing the disclosure of confidential communications cannot, after testifying to or about them, or to or about any substantial part of them, without claiming his privilege, invoke that privilege to prevent other parties to the communications from testifying to them. He cannot by his silence lay down the shield of his privilege, and assail another with the sword of his own testimony to the privileged communications, and, when his adversary essays to defend himself, or by the testimony of other parties or witnesses to such communications, again seize the shield of his privilege and shut out all testimony as to the confidential communications but his own. He has waived his privilege and 'such waiver is in no sense contrary to public policy; indeed, it is in the interest of truth and justice.'" *Steen v. First National Bank*, 8 Cir., 298 F. 36, 41. See also *Swanson v. Domning*, 251 Minn. 110, 86 N.W.2d 716; *Hurley v. McMillan*, Tex.Civ.App., 268 S.W.2d 229.

It is true that we have held that the bringing of an action does not constitute a waiver of the physician-patient privilege,

*Hogue v. Massa*, supra, but it does not necessarily follow that one who commences a lawsuit does not voluntarily submit himself or herself to adverse examination under the statute, SDCL 15–6–43(b), including questions of a nature that may require the party to claim the privilege or else be deemed to have waived it. SDCL 19–2–7 provides that, "The objection that the communication is privileged under §§ 19–2–1 to 19–2–5, inclusive, must be made by or in behalf of the person making the communication." As we said in *State v. Sinnott*, 72 S.D. 100, 30 N.W.2d 455,

"It is the right of a plaintiff in a civil action to call the defendant as a witness and interrogate him until the privilege is exercised. \* \* \* Merely being compelled to appear in obedience to a subpoena and to be sworn is no violation of the constitutional privilege and if such witness testifies he will be deemed to have done so voluntarily." 72 S.D. at 106, 30 N.W.2d at 458.

Similarly, the court in the *Steen* case, supra, said:

"It is no objection to [the witness's] waiver that his testimony at the preliminary examination was under oath, and it would have been no objection if he had been under subpoena, as he was not proved to have been, because he could, as it was, have asserted his privilege and declined to testify. As he did not do so, his testimony was in law and in fact voluntary." 298 F. at 43.

Nor is this a case in which the witness was surprised or misled, for the record of the pretrial conference discloses that counsel for both parties discussed the matter of the attorney-client privilege, although admittedly with respect to Mr. Frankhauser's proposed testimony, and submitted pretrial briefs on the matter.[4]

It is true that appellant was under some compulsion to testify concerning the nature of the communications regarding the preparation of the Iowa real estate contract, but

4. In view of these circumstances, we think that it is of no moment that the trial court did not advise appellant of her right to refuse to answer any question requiring the disclosure of any privileged communication. SDCL 19–2–8. Cf. *State v. Roth*, 84 S.D. 44, 166 N.W.2d 564.

this was a compulsion born of the evidentiary circumstances and not that imposed by law. Appellant could have claimed the privilege and foreclosed any disclosures by attorney Swift, with the result that the agreement would have stood unexplained, devastating to appellant's claim that she had not knowingly accepted the benefits of the antenuptial agreement. Perhaps appellant's only tactical choice was to do as she did, but once she disclosed her version of her communications to her attorney concerning the preparation of the real estate contract she could not later claim the privilege as a shield to shut out all testimony but her own concerning the communications. *Steen v. First National Bank,* supra.[5]

■■■ Appellant contends that the trial court erred in holding that she had waived her homestead rights by signing the agreement, arguing that an attempted waiver of homestead rights is against public policy. Although some courts have held such waivers to be invalid, see Annot. 65 A.L.R.2d § 727, we believe that the better rule is that homestead rights may be waived just as any other rights. See *Smith v. Tang,* 100 Ariz. 196, 412 P.2d 697; *In re Moore's Estate,* 210 Or. 23, 307 P.2d 483. Under South Dakota law the right of homestead is not an estate in land. *Botsford Lumber Co. v. Clouse,* 63 S.D. 147, 257 N.W. 106. SDCL 43–31–17 provides that a wife may convey or encumber the homestead. A husband can require his wife to elect between the right to occupy the homestead or take other property under the provisions of his will. *Anderson v. Anderson,* 70 S.D. 165, 16 N.W.2d 43. We have held that an antenuptial agreement that provided in part that the wife had accepted certain benefits as a complete settlement of all claims that she might have against her husband's estate constituted a valid waiver of

her statutory widow's allowances. *In re Somerville's Estate,* 64 S.D. 238, 266 N.W. 158. We see no valid reason why a similar rule should not be applied to waivers of homestead rights. Especially is this true where, as here, the language waiving the homestead rights is so clear that there can be no question concerning the intended effect of the pertinent provision in the antenuptial agreement. We need not speculate whether a waiver of homestead rights would be effective if a widow with minor children were otherwise unprovided for. Suffice it to say that in the circumstances of the instant case there is no compelling argument that the intended waiver of homestead rights does violence to the public policy of this state as expressed in Art. XXI, § 4 of our state constitution that wholesome laws be enacted providing for homestead rights.

■■■ A more difficult question is raised by appellant's contention that respondent is barred by the doctrine of res judicata from litigating in the circuit court the issue of appellant's homestead rights in the land set aside as her homestead by the district county court's order inasmuch as respondent, then represented through her guardian, did not object to or otherwise appeal from the entry of that order.

At the time the decree in question was entered, SDCL 16–9–11 provided in part that:

"The county court has original jurisdiction:

(1) To open and receive proof of last wills and testaments, to admit them to probate, to revoke the probate thereof, and to allow and record foreign wills;

(2) To grant letters testamentary, of administration, and of guardianship, and to revoke the same;

\* \* \* \* \* \*

---

5. In view of our holding that appellant waived the privilege by testifying on adverse examination, we need not decide to what extent, if any, Ralph's presence during a portion of the conversation between appellant and Mr. Swift and the presence of appellant's sister during the December 1974 conversation with Mr. Swift operated to destroy the confidentiality of those communications. See, e. g., *Henke v. Iowa Home Mutual Casualty Co.,* 249 Iowa 614, 87 N.W.2d 920; *Dunmire v. Cool,* 195 Neb. 247, 237 N.W.2d 636; *State v. Henderson,* N.D., 156 N.W.2d 700; *Bolyea v. First Presbyterian Church,* supra; Annot. 141 A.L.R. 553; 81 Am. Jur.2d Witnesses, § 187.

(8) To order and regulate all distributions of property or estates of deceased persons;

    \*      \*      \*      \*      \*      \*

(12) To exercise all the powers conferred by this title or by other law;

    \*      \*      \*      \*      \*      \*

(14) To make such orders as may be necessary to the exercise of the powers conferred upon it."

SDCL 30–20–6, as it then applied to the district county court, provided that:

"The homestead, when determined by the court, shall thereupon and forthwith be decreed by the court to be set apart from the estate for the use and possession of those entitled by law to the use and possession thereof, and the executor or administrator, as such, shall not be entitled to such possession or any of the rents and profits thereof."

On the face of these statutes, then, it would appear that it was within the jurisdiction of the district county court to make a determination concerning appellant's homestead rights and to enter a decree accordingly. If that were the fact, by not having appealed from the provisions of the decree respondent presumably would not now be heard to attack the provisions of the decree by bringing an action for quiet title and specific performance in circuit court. See, e. g., *In re Estate of Grimes,* 87 S.D. 187, 204 N.W.2d 812; *White v. White,* 76 S.D. 503, 81 N.W.2d 606; *In re Smith's Estate,* 76 S.D. 11, 71 N.W.2d 577. Respondent argues, however, that because the existence of appellant's homestead rights depended upon the validity of the antenuptial agreement and because the district county court was without jurisdiction to determine the validity of the agreement, the proceedings in the district county court are not res judicata and respondent is not bound by the provisions of the decree.

This is not a case in which the usual rules of concurrent jurisdiction between the circuit and district county court apply. See, e. g., *Spitzer v. Spitzer,* 84 S.D. 147, 168 N.W.2d 718; *Lass v. Erickson,* 74 S.D. 503, 54 N.W.2d 741; *Ewing v. Waddington,* 62 S.D. 166, 252 N.W. 28. Rather, we think the rule laid down in *Ward v. DuPree,* 16 S.D. 500, 94 N.W. 397; *In re Thompson's Estate,* 26 S.D. 576, 128 N.W. 1127; and *In re Estate of Prerost,* 40 S.D. 536, 168 N.W. 630, applies and that the district county court was without jurisdiction to determine the validity of the antenuptial agreement since it was one that was entered into before Ralph Schutterle's death and because its effect was to make appellant a stranger to the estate insofar as the real property was concerned. The question before the district county court was whether the agreement precluded appellant from claiming homestead rights in the real property. Judge Campbell stated in *Ewing v. Waddington,* supra, that it was a matter of doubt whether the county court had jurisdiction to adjudicate the equitable issues involved in a postmortem agreement among beneficiaries not to challenge the provisions of a will. We conclude that Judge Campbell's doubts were real and that the adjudication that the antenuptial agreement was invalid, a prerequisite to appellant's right to a homestead in Ralph's real estate, was beyond the district county court's jurisdiction. Accordingly, the decree setting aside a portion of the property as a homestead for appellant was null and void and respondent is not precluded by the doctrine of res judicata from maintaining the present action with respect to all of the real estate included within Ralph Schutterle's estate.

The judgment quieting title in the real property in question in respondent and decreeing specific performance of the antenuptial agreement is affirmed.

All the Justices concur.