#24045-aff in pt & rev & rem in pt-DG

**2007 SD 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JOYCE A. SMETANA,                              Plaintiff and Appellee,

  v.

ROBERT D. SMETANA,                           Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DAVISON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE RONALD K. MILLER
Judge

\* \* \* \*

RICHARD A. JOHNSON
GREGORY T. BREWERS of
Strange, Farrell & Johnson, P.C.
Sioux Falls, South Dakota                    Attorneys for plaintiff
                                             and appellee.


E. STEEVES SMITH of
Tinan, Smith and Bucher
Mitchell, South Dakota                       Attorneys for defendant
                                             and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 27, 2006

OPINION FILED **01/10/07**

#24045

GILBERTSON, Chief Justice

[¶1.]     Robert D. Smetana appeals the property division in a judgment and decree of divorce from Joyce A. Smetana.  He contends that the trial court erroneously invalidated the antenuptial agreement between the parties and improperly awarded Joyce attorney fees.  We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURE

[¶2.]     Robert and Joyce were married on September 8, 1978.  At the time of marriage, Robert was fifty-two years old and Joyce was forty-four years old.  This was a second marriage for both parties.  Prior to the marriage, Joyce had obtained a bachelor's degree in Psychology and Elementary Education and a master's degree in Special Education and Reading.  She worked at Delmont Public Schools and later the Mental Healthcare Center in Mitchell and Dakota Wesleyan University.  After the marriage, Joyce continued to work outside of the home until 1986.  She also assisted in the farming operation by disking, combining and acting as a "gopher" for Robert.  In addition, Joyce attended to the gardening, cleaning, cooking and laundry.  The farming operation incorporated in 1980, and in 1988, Joyce assumed the duties of bookkeeper for Smetana Farms, Incorporated.

[¶3.]     Robert owned and operated farms in North Dakota until 1967 when the machinery and equipment were sold.  Thereafter, the North Dakota farmland was rented out.  The trial court did not include any of the North Dakota land as marital property.  Robert moved to South Dakota in 1957 and began purchasing land there.  In 1963, Robert purchased land from E.F.Colfax on a fifteen-year

contract for deed. This contract, however, was not paid off until October 1988, ten years after the marriage. Although a portion of the value of this land was deemed pre-marital, approximately forty percent was included in the marital estate.

[¶4.]    Also, in 1973, Robert purchased 17 acres from Melvin Potthast by warranty deed. He completely paid for this parcel before the marriage. However, eighty percent of the value of the Potthast land was included in the marital portion. Robert acquired another 233.94 acres of land in South Dakota by two contracts for deed from William and Joe Hank in 1974. One contract, for 155.87 acres, was paid in full in 1976, about two years before Robert and Joyce married. The other contract, for 78.07 acres, extended until March 1, 1981. The record reflects that half of this contract for 78.07 acres was paid before the marriage. However, eighty-four percent of the value of the entire 233.94 acres was included in the marital estate as Robert's property. At the time of the marriage, Robert owned and operated this land in South Dakota. After the marriage, Robert acquired another 163 acres of land, which was all included in the marital estate as Robert's property.

[¶5.]    Two days before their marriage the parties entered into an antenuptial agreement prepared by Joyce's attorney. The entire antenuptial agreement consisted of the following language:

> This antenuptial contract entered into this 6th day of
> September, 1978, between Robert D. Smetana of Fulton, South
> Dakota, hereinafter for convenience referred to as Husband, and
> Joyce Funkhauser King of Mitchell, South Dakota, hereinafter
> for convenience referred to as Wife, Witnesseth:
> I.      Husband and Wife intend to marry each other soon, and it
> is agreed that after such marriage, all of the properties of any
> name or nature, real, personal or mixed, wherever they may be
> found, belonging to Husband before marriage shall be and
> remain forever his personal estate, and that this shall include

all interest, rents, and profits which may in time accrue or result in any manner from increase in value, or be collected for the use of the same in any way.

II.    All properties of any name or nature, real, personal or mixed, wherever the same shall be found which belong to Wife before marriage shall be and remain forever her personal estate, and this shall include all interest, rents, and profits which may in time accrue or result in any manner from increase in value, or be collected for the use of the same in any way.

III.    Each party agrees to sign with the other, all title paper, deeds or other papers necessary to transfer property when sold to a purchaser, in any event, it is necessary that such title papers be executed by a man and wife, either in the State of South Dakota or any other State, and this courtesy shall be prompt at any time and in any place.

IV.    Husband agrees to, from his own personal estate, assume necessary expense of support and maintenance of Wife.

V.    Nothing herein shall be construed to be a bar to either party to this agreement, giving any property of which they may be possessed to the other party by will or otherwise. Each party to this agreement shall control their personal estate as described herein, and do with the properties thereof whatsoever they wish and will, by his or her orders or directions or by will, the same as either could or would do if no marriage existed between them. That upon the demise of each party, their personal estates shall pass by their individual Wills, or by law to their individual heirs, and each party waives any claim participation they may otherwise be entitled to by law in the estate of the other.

The antenuptial agreement did not set forth in detail or even list what Joyce and Robert each owned prior to the marriage. After receiving briefs from both parties, the trial court found that the agreement was ineptly drawn and did not adequately disclose the nature and extent of either Joyce's or Robert's assets or liabilities. The court further found that Joyce did not have a reasonable approximation of the magnitude of Robert's wealth and the agreement did not contain adequate provisions for Joyce in the event of divorce. Therefore, the court concluded that the antenuptial agreement was invalid as unconscionable. The court further mentioned that "the values to be received by the parties would make little if any difference at

all in any final division if the court were to hold the antenuptial agreement valid or invalid."

[¶6.]     After twenty-five years of marriage, Joyce filed for divorce on June 21, 2003. During the course of the trial, the court made rulings on several disputed property issues. At the conclusion of the trial, the court awarded Joyce one fourth of her attorney's fees, approximately $6,600. Robert appeals:

1. Whether the trial court erred when it invalidated the antenuptial agreement.

2. Whether the trial court abused its discretion when it awarded Joyce attorney fees.

## STANDARD OF REVIEW

[¶7.]     "An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." SDCL 25-2-21(b). "We review question[s] of law under the de novo standard." Sanford v. Sanford, 2005 SD 34, ¶12, 694 NW2d 283, 287 (citations omitted). "Findings of fact, reviewed under the clearly erroneous standard, will not be overturned unless the reviewing court is left with a firm conviction that a mistake has been made." Godfrey v. Godfrey, 2005 SD 101, ¶11, 705 NW2d 77, 80 (citation omitted). "An award of attorney fees is reviewed under the abuse of discretion standard." Crisman v. Determan Chiropractic, Inc., 2004 SD 103, ¶24, 687 NW2d 507, 513 (citing City of Sioux Falls v. Johnson, 2003 SD 115, ¶6, 670 NW2d 360, 362).

## ANALYSIS AND DECISION

[¶8.]     **1.     Whether the trial court erred when it invalidated the antenuptial agreement.**

[¶9.] It must first be noted that "antenuptial agreements are favored in law since they allow parties to protect the inheritance rights of their respective children by prior marriages and thus prevent subsequent strife over the disposition of their respective estates." Schutterle v. Schutterle, 260 NW2d 341, 347 (SD 1977), *superseded by statute on other grounds,* SDCL 19-13-3, *as recognized in* State v. Catch the Bear, 352 NW2d 640, 645 (SD 1984) (citations omitted). Taking this fact into consideration, this Court first set forth the criteria for determining the enforceability of antenuptial agreements in *Schutterle* when it stated,

> [s]ome courts appear to have established a hard and fast rule that there must have been a full and frank disclosure by the prospective husband to his prospective wife concerning the nature and extent of his property before an antenuptial agreement will be held to be valid and binding as against the wife. We conclude, however, that the better rule is that under which an antenuptial agreement will be held valid if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the prospective spouse, or if the prospective spouse has been adequately provided for by the agreement.

260 NW2d at 348 (citations omitted). In *Schutterle*, "the trial court found that although Ralph had made no disclosure to Edna of the exact extent and value of his estate prior to their marriage, Edna had learned during their courtship that Ralph owned land, livestock and farm machinery in South Dakota." *Id.* This Court was persuaded by the totality of the circumstances that Edna "had sufficient knowledge of the nature and extent of Ralph's property to satisfy the alternative tests of disclosure or independent knowledge." *Id.* at 349.

[¶10.]        "The validity of an antenuptial agreement is to be decided on the basis of the facts of each case." Ryken v. Ryken (*Ryken II*), 461 NW2d 122, 125 (SD 1990) (citing Ryken v. Ryken (*Ryken I*), 440 NW2d 300, 304 (SD 1989); *Schutterle*, 260 NW2d at 348). This is so because each decision involving the validity of antenuptial agreements "depends upon the circumstances peculiar to the parties, factors such as the respective age of the parties, their prior marital status, the number and ages of children from prior marriages, [and] the nature and extent of the property owned by the parties . . . ." *Schutterle*, 260 NW2d at 348.

[¶11.]        This Court has "address[ed] what constitutes a 'fair and reasonable disclosure' in the context of SDCL 25-2-21." *Sanford*, 2005 SD 34, ¶42, 694 NW2d at 294. However, this statute did not come into existence until after the parties' marriage. In 1989, South Dakota enacted the Uniform Premarital Agreement Act (UPAA), which is codified as SDCL 25-2-16 through 25-2-25. Robert contends that these statutes do not apply retroactively to the agreement in this case. He claims the validity of the antenuptial agreement must be reviewed only under case law in existence at the time the agreement was executed. Joyce argues, however, and this Court agrees, that enactment of the UPAA did not alter the legal analysis concerning the validity of antenuptial agreements. Instead, enactment of the UPAA codified previous precedent. The statute relevant to enforcement of antenuptial agreements is SDCL 25-2-21, which provides in pertinent part:

> (a)  A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
> (1)  That party did not execute the agreement voluntarily; or
> (2)  The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

>(i)  Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>(ii)  Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>(iii)  Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Much of this language and analysis is contained in the earlier cases of *Schutterle* and *Ryken I*.  260 NW2d at 347-50; 440 NW2d at 304.  Thus, for purposes of this appeal, precedent established after the enactment of the UPAA is relevant and useful in determining the validity of the antenuptial agreement.

[¶12.]     On those occasions where this Court analyzed what constitutes a "fair and reasonable disclosure," "we held the burden of disclosure rests with each spouse, rather than placing an obligation on one spouse to determine the extent of the assets of the other spouse." *Sanford*, 2005 SD 34, ¶42, 694 NW2d at 294 (citing *Ryken II*, 461 NW2d at 125).  "It does not fall upon a spouse to assume the role of detective in an attempt to ferret out the existence and value of the other spouse's assets." *Id*.  This Court further stated:

>It is not necessary, given the language in SDCL 25-2-21, for a spouse to provide a detailed and exact valuation of his or her net worth in a prenuptial agreement.  It is sufficient for a spouse to provide, within the best of his or her abilities, a list of assets and liabilities with approximate valuations.  The listing must be sufficiently precise to give the other spouse a reasonable approximation of the magnitude of the other spouse's net worth.

*Id*.

[¶13.]     In the instant case, Robert did not supply any list of assets or liabilities at any time.  Robert claims, however, that Joyce became aware of his

assets during their fourteen-month courtship. Although Joyce admits to knowing Robert owned land in both South Dakota and North Dakota, a home, grain bins and farm machinery, this does not establish that she was aware of Robert's net worth. Moreover, she was not aware of any of Robert's liabilities. However, according to *Schutterle*, an antenuptial agreement may still be valid despite a prospective spouse's lack of knowledge concerning the nature and extent of the other spouse's property. If the prospective spouse is adequately provided for in the agreement, then a lack of knowledge concerning the other spouse's property is immaterial, and the antenuptial agreement is still valid. *Schutterle*, 260 NW2d at 348.

[¶14.]  The agreement in this case made no provision for Joyce in the event of divorce. In fact, the agreement did not even mention divorce. This fact raises another issue concerning the validity of the antenuptial agreement and its applicability to a divorce proceeding.

[¶15.]  "This Court addressed whether an antenuptial agreement applied to a divorce action in [*Ryken I*]." Roth v. Roth, 1997 SD 75, ¶15, 565 NW2d 782, 786 (citing *Ryken I*, 440 NW2d at 304). "The trial court [in *Ryken I*] held the agreement was inapplicable to divorce proceedings because it failed to mention divorce." *Id*. This Court reversed, concluding that a divorce action was contemplated where the language of the agreement provided for applicability during legal proceedings. *Id*. However, unlike the agreement in *Ryken I*, the antenuptial agreement in this case does not mention divorce, legal proceedings, or anything of that nature. This Court has stated that "settled law elsewhere clearly indicates 'an agreement that did not contain any reference to divorce, and recited that it only affected the parties' rights

during marriage or upon death, could not be employed by a divorce court as if it were the property settlement in the dissolution proceedings.'" *Id.* ¶13 (citations omitted).

[¶16.]    Robert urges this Court to consider the parties' intent that the agreement was executed in contemplation of divorce. However, "[t]his Court looks 'to the language that the parties used in the contract to determine their intention.'" Pauley v. Simonson, 2006 SD 73, ¶8, 720 NW2d 665, 667-68 (quoting Ziegler Furniture and Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ¶16, 709 NW2d 350, 355 (citations omitted)). "If that intention is clearly manifested by the language of the agreement, it is the duty of this Court to declare and enforce it." *Id.* Further, "there is a presumption that a written agreement proclaims the ultimate intention of the parties." *Roth*, 1997 SD 75, ¶17, 565 NW2d at 786 (citation omitted). "Parol and extrinsic evidence may be used for clarification" only when "the contract is 'uncertain or ambiguous.'" *Pauley*, 2006 SD 73, ¶8, 720 NW2d at 668 (citing Jensen v. Pure Plant Food Intern., Ltd., 274 NW2d 261, 263-64 (SD 1979)). With regards to ambiguity, this Court has clearly stated:

> "A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract." Rather, a contract is ambiguous only when "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."

*Roth*, 1997 SD 75, ¶16, 565 NW2d at 786 (internal citations omitted). A review of the four corners of the document reveals the antenuptial agreement between Robert and Joyce fails to mention divorce or separation in any manner. Therefore, we conclude that the antenuptial agreement in this case

is unambiguous as a matter of law as it clearly applies to the distribution of property upon the death of one of the parties, not to divorce.

[¶17.] For all of the reasons set forth above, we conclude the trial court was correct in concluding that the antenuptial agreement was invalid.

[¶18.] **2. Whether the trial court abused its discretion when it awarded Joyce attorney fees.**

[¶19.] Robert objects to the award of attorney fees to Joyce for several reasons. First, Robert contends that Joyce's complaint requested, in the wherefore clause, that each party pay their own attorney fees. Robert also claims the court abused its discretion in awarding attorney fees without a hearing and without entering findings of fact and conclusions of law respecting attorney fees. This Court has stated:

> The award of attorney fees is authorized by SDCL 15-17-38. Whether an award is warranted, however, is left to the sound discretion of the court. When making this determination, the court must first decide whether the fees are reasonable; then, using our standard factors, it must establish whether an award is necessary. The elements a court should consider are "the property owned by each party, their relative incomes, whether the property of the parties is in fixed or liquid assets, and whether the actions of either party unreasonably increased the time spent on the case."

Keller v. Keller, 2003 SD 36, ¶18, 660 NW2d 619, 624 (internal citations omitted).

> Additional factors to be considered are: (1) the intricacy and importance of the litigation; (2) labor and time involved; (3) the skill required to draw the pleadings; (4) discovery procedures utilized; (5) existence of complicated legal problems; (6) the time required to try the case; (7) whether written briefs were required; and (8) whether an appeal to this court is involved.

Grode v. Grode, 1996 SD 15, ¶38, 543 NW2d 795, 804 (citing Garnos v. Garnos, 376 NW2d 571, 575 (SD 1985)); *see also, Crisman*, 2004 SD 103, ¶29, 687 NW2d 507, 514.

[¶20.] Furthermore, "[t]his Court has consistently required trial courts to enter findings of fact and conclusions of law when ruling on a request for attorney fees." *Crisman*, 2004 SD 103, ¶30, 687 NW2d at 514 (citing Hoffman v. Olsen, 2003 SD 26, ¶10, 658 NW2d 790, 793). "The trial court is required 'to make specific findings based upon the factors.'" *Id*. (quoting Duffy v. Cir. Ct., Seventh Jud. Cir., 2004 SD 19, ¶18, 676 NW2d 126, 134).

[¶21.] In this case, the trial court made a finding in its judgment and decree of divorce and in its findings of fact and conclusions of law that "Robert shall pay to Joyce the sum of $6,600.00 for and as attorney fees." This fails to comply with our requirements set forth above. Thus, we reverse and remand for reconsideration of the attorney fees issue in accordance with our settled procedure.

[¶22.] Robert and Joyce each submitted a motion for appellate attorney fees, supported by itemized statements of services performed and costs. We award Joyce the sum of $3,000 in appellate attorney fees.

[¶23.] Robert has also raised various other issues concerning the trial court's division of marital property. We have reviewed them and find them to be without merit.

[¶24.] Affirmed in part and reversed and remanded in part.

[¶25.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.