#24466-a-RWS

**2008 SD 82**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
ESTATE OF RONALD W. SMID,
DECEASED.

AUDREY E. SMID,                                    Plaintiff and Appellant,

  v.

DALE D. SMID, as the Trustee of the
Ronald W. Smid Revocable Trust,                    Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE SCOTT P. MYREN
Judge

* * * *

DREW C. JOHNSON
Aberdeen, South Dakota                             Attorney for plaintiff
                                  and appellant.

KIMBERLY A. DORSETT of
Richards, Oliver & Dorsett
Aberdeen, South Dakota                             Attorneys for defendant
                                  and appellee.

* * * *

ARGUED MARCH  28, 2007

OPINION FILED **08/13/08**

#24466

SABERS, Justice.

[¶1.]	With her husband's death imminent, Audrey Smid signed documents creating a trust, which gave her an interest in the marital home, but left the remainder to her husband's children from a prior marriage. She challenges the circuit court's decision that the waiver of her surviving spouse statutory rights contained within trust documents was valid. We affirm.

**FACTS**

[¶2.]	Ronald W. Smid was married to Delores Smid until her death on September 17, 1996. The couple had four children. During the marriage, the couple purchased a home with money Delores inherited from her parent's estate. After her death, Ronald continued to live in this home. Ronald was diagnosed with cancer in 1997.

[¶3.]	Ronald met Audrey Smid and later married her on March 16, 1999. Audrey was aware of Ronald's cancer diagnosis. During the marriage, they lived in the same home purchased with a portion of Delores' inheritance.

[¶4.]	In January of 2003, Ronald's son, Dale Smid, became concerned about his father's failing health and the plans for his father's estate. Dale spoke with attorney Roy Wise about meeting with his father and getting his affairs in order. Wise agreed to meet with Ronald.

[¶5.]	Wise met with Ronald and Audrey and Audrey's brother, Darwin Bettman, on January 24, 2003. Dale alleged that during this meeting, Bettman told Wise that he was familiar with estate planning matters and his attorney was Ken Gosch. Wise testified that he assumed Darwin was helping Audrey with this

-1-

matter and legal counsel was available through her brother. Wise wanted to conduct the meeting with Ronald alone, but Ronald desired Audrey to be present the entire time.

[¶6.] During this meeting, Ronald informed Wise that he wanted the marital home to go to his and Delores' children. However, he wanted Audrey to be able to live in the home as long as she wished, with forfeiture only for remarriage, abandonment or death. Upon any of these events, ownership would pass to his children. Wise told Ronald and Audrey that the best way to fulfill these wishes was to create a trust and transfer the ownership of the marital home to the trust, with an interest in Audrey. He also explained that the trust should require the real estate taxes, insurance, and upkeep expenses remain Audrey's responsibility while she lived in the home. According to Wise, Audrey wanted to fulfill her dying husband's wishes.

[¶7.] Wise asked Ronald about any other important assets that should be considered to get his final affairs in order. Ronald indicated Audrey should be the beneficiary of his IRA and receive some savings bonds. Audrey volunteered to complete the change of beneficiary paperwork. Ronald indicated his sons should receive his gun collection and Delores' jewelry should go to their daughters. Additionally, Audrey gave Wise a box containing important documentation regarding his assets. Wise reviewed each document and prepared a list. Audrey was with Wise during this entire process, although she alleges she never reviewed any document or received the detailed list of assets. Wise also testified Audrey was present when he reviewed the list of assets with Ronald.

[¶8.]    On January 27, 2003, Audrey called Wise and said Ronald decided to proceed with the trust for the marital home. Wise drafted the trust documents and met with Ronald and Audrey on January 29, 2003. During this meeting, Wise explained the trust documents. He then left the documents for their consideration and returned later that day to have Audrey and Ronald sign the trust documents and the deed,[1] which transferred ownership of the house to the Ronald W. Smid Revocable Trust (Trust). While the trust documents specifically declared Audrey would be waiving her statutory rights as surviving spouse, Wise did not discuss them with her. Audrey did not obtain counsel prior to signing the documents. Ronald passed away about 3:30 a.m. January 30, 2003.

[¶9.]    Informal probate proceedings were commenced in April of 2006 and Audrey was appointed personal representative of the estate. Audrey continued to live in the marital home after Ronald's death, but due to a sewer maintenance problem that she claimed would cost $5000 to repair, the house was sold and she moved out of the marital home in April of 2006. Audrey sued Dale as trustee for the Trust, claiming the marital home proceeds should be removed from the trust and placed in the probate estate because the waiver of her surviving spouse statutory rights[2] was not valid. Dale alleged Audrey was in breach of the trust and

---

1.    The house was still owned in joint tenancy with Delores. Wise prepared an affidavit for termination of life estate to remove Delores from the title so the house could be transferred to the revocable trust.

2.    The surviving spouse rights that Audrey alleges she is entitled to are:

    Intestate share of $100,000 plus one-half of any balance above that amount in the estate provided in SDCL 29A-2-102; Family allowance of up to $18,000 in

(continued . . .)

counterclaimed for specific performance of the trust. Audrey claimed she did not voluntarily waive her surviving spouse statutory rights, she only signed the trust agreement to "avoid probate" and her waiver was a result of fraud, mistake or undue influence. The circuit court found against Audrey, finding she voluntarily waived her rights and concluding the waiver was valid and the agreement was enforceable. It ordered the marital home proceeds to be distributed in accordance with the trust.

[¶10.]    Audrey appeals raising the following issues:

1.    Whether the circuit court erred when it found the trust agreement and Audrey's waiver enforceable under SDCL 29A-2-213.

2.    Whether the circuit court erred when it found Audrey's waiver was not obtained through fraud, undue influence or mistake; and therefore, whether the circuit court erred when it found the revocable trust agreement was not voidable or otherwise subject to rescission under SDCL 53-11-2.

## STANDARD OF REVIEW

[¶11.]    The circuit court's "findings of facts, reviewed under the clearly erroneous standard, will not be overturned unless the reviewing court is left with a firm conviction that a mistake has been made." Smetana v. Smetana, 2007 SD 5, ¶7, 726 NW2d 887, 891 (quoting Godfrey v. Godfrey, 2005 SD 101, ¶11, 705 NW2d 77, 80). Conversely, conclusions of law are reviewed de novo. Id. (quoting Sanford v. Sanford, 2005 SD 34, ¶12, 694 NW2d 283, 287). "The credibility of the witnesses,

_____

(. . . continued)
one year provided in SDCL 29A-2-403; and Homestead allowance of $30,000 provided in SDCL 29A-2-402.

the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence." *In re* Estate of Gustafson, 2007 SD 46, ¶13, 731 NW2d 922, 926 (quoting *In re* Estate of Schnell, 2004 SD 80, ¶8, 683 NW2d 415, 418). Whether the waiver of the surviving spouse statutory rights is unconscionable "is a decision by the court as a matter of law." SDCL 29A-2-213.

[¶12.]     **1.     Whether the circuit court erred when it found the trust agreement and Audrey's waiver enforceable under SDCL 29A-2-213.**

[¶13.]     With her husband's death approaching, Audrey signed the trust documents, which contained the following waiver provision:

> SETTLOR'S WIFE'S WAIVER OF RIGHTS:
>
> The settlor's wife (Audrey Smid) by executing this Agreement and by executing and delivering the Warranty Deed, on behalf of herself, her heirs, legal representatives and assigns, waives and renounces any and all rights of homestead, surviving spouse award, surviving spouse right of election, exemption, family allowance, inheritance, descent, or other marital right arising by virtue of statute or otherwise, in and to the real property.

Audrey argues that her waiver was unconscionable or not voluntary as set forth in SDCL 29A-2-213. That statute provides that a surviving spouse may waive any and all rights of the surviving spouse but:

> (b) A surviving spouse's waiver is not enforceable if the surviving spouse proves that:
>     (1) the waiver was not executed voluntarily; or
>     (2) The waiver was unconscionable when it was executed and, before execution of the waiver, the surviving spouse:
>         (i)     Was not provided a fair and reasonable disclosure of the property or financial obligations of the decedent;

>   (ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the decedent beyond the disclosure provided; and
>
>   (iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the decedent.

SDCL 29A-2-213.[3] Moreover, Audrey argues that she did not receive a disclosure of

Ronald's property and financial obligations as required by the statute.

---

3.  The entire text of the statute is as follows:

(a) The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property, and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the surviving spouse.
(b) A surviving spouse's waiver is not enforceable if the surviving spouse proves that:
(1) The waiver was not executed voluntarily; or
(2) The waiver was unconscionable when it was executed and, before execution of the waiver, the surviving spouse:
(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the decedent;
(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the decedent beyond the disclosure provided; and
(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the decedent.
(c) An issue of unconscionability of a waiver is for decision by the court as a matter of law.
(d) Unless it provides to the contrary, a waiver of "all rights," or equivalent language, in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation or divorce is a waiver of all rights of elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits that would otherwise pass from the other by intestate succession or by virtue of any will executed before the waiver or property settlement.

[¶14.] First, Audrey argues that her waiver was not voluntary. Voluntary is not defined in SDCL 29A-2-213. Audrey alleges that in order for waiver to be voluntary, one must have "knowledge of essential facts." (Citing Black's Law Dictionary (4th ed)). Therefore, Audrey argues that her waiver was not voluntary because she did not know about the essential facts and law behind the document she signed. Dale argues that voluntary does not mean a "knowing and voluntary" waiver. Instead, he argues that voluntary means the action was "done by design or intention, intentional, proposed, intended, or not accidental." (Citing Black's Law Dictionary (Revised 4th ed 1968)).

[¶15.] Audrey admits that she "was not physically forced to sign the document[.]" Audrey testified that she did not know what her surviving spouse rights were, that she was under stress and extremely upset because her husband was dying and she did not give the transaction much thought. She also alleged that she signed the document to "avoid probate." However, she also testified that she knew Ronald wished for his children to have the home and she wanted to fulfill his dying wishes and give him peace of mind.

[¶16.] The circuit court conducted a two-day bench trial regarding Audrey's claims. After hearing the testimony of the witnesses, the court specifically rejected Audrey's factual claims. Specifically, it found that Audrey knew her husband was dying, his impending death was not a shock, she was mentally and emotionally stable, and his death did not unduly interfere with her ability to understand and comprehend the events. The court also found Audrey knew and understood the home was to go to Ronald's children, but she would be allowed to live there as long

as she wished. It found she knew and understood she had to pay taxes, insurance and upkeep expenses while living there.[4] Finally, the court found Audrey voluntarily signed the trust documents and deed.

[¶17.] While Audrey argues that she lacked full knowledge of the facts and law, we have held that "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party." Holzer v. Dakota Speedway, Inc., 2000 SD 65, ¶28, 610 NW2d 787, 795 (quoting LPN Trust v. Farrar Outdoor Adver., Inc., 1996 SD 97, ¶13, 552 NW2d 796, 799) (additional citations omitted). There is no evidence that Audrey was forced to sign the waiver; Audrey admits as much. In addition, more than three years passed before she ever claimed she signed the documents involuntarily. As Audrey has not met her burden of demonstrating otherwise, the circuit court's finding that her waiver was voluntary is not shown to be in error.

[¶18.] The dissent argues that we should impose a more benevolent standard when considering the definition of voluntary. It claims that this "Court embraces [a] bleak and mercantile view of marriage" and urges several newly developed factors that should be considered when determining if a post nuptial agreement should be enforced. *See infra* ¶42 (Konenkamp, J., dissenting). First, Audrey's

---

4. Wise testified that Audrey knew she was to pay the expenses associated with living in the home. The trust was only to contain the home and the trust would have no assets or income besides the home to pay for the expenses. He had taken contemporaneous notes from all his conversations with Audrey and Ron and used the notes during his testimony.

counsel conceded he did not argue to the circuit court that Ron had this independent fiduciary duty due to marriage. Audrey's counsel admitted that he only presented this case under the statute, SDCL 29A-2-213. More importantly, our case law already has a standard for determining whether a postnuptial agreement should be enforced.

[¶19.] In *Estate of Gab*, this Court upheld a postnuptial agreement between married parties. 364 NW2d 924, 925 (SD 1985). In that case, both parties, Edwin and Frances, had children from prior marriages. Both parties had real and personal property when they married each other. Both continued to work during the majority of the marriage and each made substantially equal financial contributions during the eight-year marriage. *Id.*

[¶20.] Frances and Edwin executed wills specifically excluding each other as heirs and bequeathed all of their individual residuary estates to their own children. Additionally, the couple entered into a postnuptial property agreement that stipulated neither party would revoke or amend their wills without written consent of the other. However, when Edwin died in 1982, Frances petitioned the court to take her elective share of his estate. The trial court denied her petition.

[¶21.] In upholding the postnuptial agreement, this Court recognized that such agreements are lawful and that we have "endorsed property agreements between spouses as a method of protecting the inheritance rights of their children by previous marriages." *Id.* Moreover, we noted that "courts have recognized that it is natural and proper for a parent to desire to provide for the children of his or her first marriage." *Id.*

[¶22.] According to *Estate of Gab*, postnuptial agreements are subjected to close scrutiny because of the confidential relationship between husband and wife.[5] *Id.* at 925-26 (citing *In re* Estate of Harber, 449 P2d 7 (Ariz 1969); Posner v. Posner, 257 So2d 530 (Fla 1972); Rockwell v. Estate of Rockwell, 180 NW2d 498 (MichCtApp 1970); White v. White, 313 A2d 776 (Pa 1973)). Nonetheless, a postnuptial agreement will be upheld if "the extent and nature of the decedent's property was revealed, and so long as the agreement was entered into 'freely and for good consideration[.]'" Estate of Gaspar v. Vogt, Brown & Merry, 2003 SD 126, ¶9, 670 NW2d 918, 922 (quoting *Estate of Gab*, 364 NW2d at 926). As developed more fully below, Audrey was aware of the "extent and nature of [Ronald's] property." *See infra* ¶24-25. Moreover, Audrey entered into the agreement freely. At oral argument Audrey's counsel claimed her husband or her husband's attorney should have explained in detail what her waiver of her rights meant. However, Ron *insisted* she be present the entire time Attorney Wise explained the document. The document explained she would be waiving certain statutory rights,[6] yet she did not ask one question or express *any* concern about what rights she would be waiving. Audrey's counsel argued that she did not know she had a choice but to sign the document. However, she testified she wanted to fulfill her husband's dying wishes.

---

5. Although the issue of a separate fiduciary duty between husband and wife was discussed at oral argument, it was not raised or argued at trial, or briefed on appeal and therefore waived. Millard v. City of Sioux Falls, 1999 SD 18, ¶30, 589 NW2d 217, 221 (additional citations omitted).

6. While Attorney Wise did not specifically explain what these rights meant, he did go through the entire document in Audrey's presence. So she at least heard she had these rights and was giving up these rights.

[¶23.]     Importantly, the trial court found:

30. Audrey knew her husband was dying.  Ron's impending death was not a surprise or shock to Ron or Audrey.

31. Ron's impending death was not unduly interfering with Audrey's ability to understand and comprehend the events unfolding around her.

32. Audrey was stable in her emotions and intellect.

33. She knew Ron was dying and wanted to help him fulfill his last intentions.

34. She knew and understood that Ron wanted his children to have the house.

35. She knew and understood that Ron wanted her to live in the house as long as she wished.

36. She knew and understood that she would have to pay for expenses of upkeep for the house while she lived there.

The trial court had the opportunity to listen to Audrey, her brother Darren and Attorney Wise and weigh their credibility.  Audrey has not met her burden of demonstrating the trial court's factual findings are clearly erroneous.

[¶24.]     Moreover, Audrey received consideration for the agreement.[7]  Under our already established standard for postnuptial agreements, Audrey and Ronald's agreement should be, and is upheld.

[¶25.]     Next, Audrey argues that the waiver was unconscionable because she would have received at least part of Ronald's estate without the waiver.  Now, she alleges that she receives nothing from the estate if the waiver is enforceable.  The marital home is the only property in the trust and the remainder of Ronald's estate

---

7.     *See* note 23, *infra.*

was held jointly with various individuals, including Audrey. Therefore, as the circuit court found, Audrey has received significant monetary amounts from accounts that she held jointly with Ronald.[8] Moreover, Ronald owned the home before he met Audrey and it was paid for with his first wife's inheritance. While Audrey continued to work after the marriage and support the couple, there is no other evidence that Audrey contributed to the house financially during her marriage to Ronald. Ronald wanted to leave the home to his children with his first wife, and yet wanted Audrey to be able to live in the home as long as she wished, provided that she paid for the taxes, insurance and maintenance.[9] Audrey has not met her burden of demonstrating the waiver was unconscionable at the time it was executed. *See* Wilkes v. Estate of Wilkes, 27 P3d 433, 437 (Mont 2001) (affirming the trial court's finding that a prenuptial agreement was not unconscionable in part because the disputed residence was the home of his two children from a prior

---

8.   According to Plaintiff's Exhibit 7, Audrey received approximately $45,000, including property (furniture and vehicle) and certificates of deposits, shares, and an IRA. There is no evidence or allegation that Audrey contributed to the value of these accounts during the marriage.

9.   Audrey was approximately fifty-three years old at the time of her husband's death in 2003. Based on mortality tables from 2003, Audrey could expect to live another 29.7 – 30.6 years. *See* Arias, Elizabeth, National Vital Statistics Reports, Vo. 54 No. 14, Table 3. Life table for females: United States, 2003 (revised March 28, 2007) *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr54/nvsr54_14.pdf) (accessed April 14, 2008). She had the right to live in the home rent free until her death, however many years later. In this case, this could amount to approximately 82% of the value of the home or approximately $82,000. *See* Actuarial Values: Remainder, Income, and Annuity Factors – For One Life, Two Lives, and Terms Certain, Publication 1457 (7-1999), Table S. § 1 (8.6), *available at* http://www.irs.gov/pub/irs-pdf/p1457.pdf (accessed on April 14, 2008); *see also* 26 CFR § 20.2031-7.

marriage and the new spouse contributed nothing to the assets the decedent obtained prior to the marriage).

[¶26.] Additionally, Audrey cannot prove the second requirement of SDCL 29A-2-213(b)(2)(i)-(iii). Both Wise and Audrey testified that she brought a box full of financial documents to the kitchen for Wise to review. Wise testified that Audrey was present when he went through each document and while he prepared a detailed list regarding Ronald's finances. He testified that Audrey knew exactly what Ronald's holdings were and she was in the process of transferring those holdings over to her name alone.

[¶27.] The circuit court heard both Audrey and Wise testify and resolved the conflict in testimony against Audrey. *See* Fin-Ag v. Feldman Bros, 2007 SD 105, ¶38, 740 NW2d 857, 866 ("The trial court is the judge of credibility and it is the trial court's duty to weigh the testimony and resolve any conflicts."). She cannot prove that she did not know Ronald's financial status, nor can she prove that she did not have an adequate opportunity to know of his financial holdings.[10] She retrieved the

---

10.    Audrey seems to allege that there was no disclosure of Ronald's finances because Wise did not provide her with an actual compiled list of Ronald's assets. However, "the . . . spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the . . . spouse[.]" Smetana v. Smetana, 2007 SD 5, ¶9, 726 NW2d 887, 892 (quoting Schutterle v. Schutterle, 260 NW2d 341, 348 (SD 1977) (analyzing an antenuptial agreement). Therefore, Audrey did not need the actual compiled list to gain adequate knowledge of Ronald's property; the knowledge she gained when Wise went through the documents in front of her, documents that she provided, is sufficient. Wise testified that Audrey knew exactly what Ronald's holdings were as he inventoried the documents while she and her brother were present. Wise also testified that

(continued . . .)

box containing the financial documents and had ample opportunity to examine the documents while Wise conducted his review. She has not demonstrated that the circuit court erred in finding against her and holding the requirements of SDCL 29A-2-213 were not met.

[¶28.] **2. Whether the circuit court erred when it found Audrey's waiver was not obtained through fraud, undue influence or mistake; and therefore, whether the circuit court erred when it found the revocable trust agreement was not voidable or otherwise subject to rescission under SDCL 53-11-2.[11]**

[¶29.] Audrey alleges that the trust agreement is voidable or otherwise subject to rescission because her waiver was obtained through constructive fraud (SDCL 53-4-6), undue influence (SDCL 53-4-7) or mistake (SDCL 53-4-8). SDCL 53-4-1 provides that "apparent consent is not real or free and is voidable when obtained through: (1) Duress; (2) Fraud; (3) Undue influence; or (4) Mistake."

*Constructive fraud*

[¶30.] Audrey's claim of fraud is alleged to be constructive fraud under SDCL 53-4-6, which provides:

> Constructive fraud consists:
>
> (1) In any breach of duty which, without any actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading

_____

(. . . continued)
Audrey was present when he explained the state of his financial affairs to Ronald.

11. Audrey's claim the agreement is entitled to rescission is based upon the same arguments as the claim the agreement is voidable; therefore, plaintiff's issue 2 and issue 3 have been combined.

> another to his prejudice or to the prejudice of anyone
> claiming under him; or
>
> (2) In any such act or omission as the law specially
> declares to be fraudulent, without respect to actual fraud.

Audrey alleges that Ronald had a statutory duty to make a full disclosure to her of his financial holdings and what she was giving up by signing the waiver. She argues that by misleading her to her prejudice by breaching this duty, his estate gained an advantage.

[¶31.] The circuit court rejected Audrey's claims and specifically found that Audrey had a full disclosure of Ronald's finances. She was present during Wise's review of the financial documents that Audrey provided and this constitutes disclosure of his finances. Audrey has not met her burden of showing the circuit court erred in determining there was not constructive fraud.

[¶32.] Additionally, Audrey alleges that she was misled into believing Wise was her attorney and looking out for her interests. Audrey argues that Professional Rule of Conduct Rule 4.3 (SDCL 16-18 Rule 4.3) required Wise to inform Audrey he was not her attorney and that she should seek legal counsel. Rule 4.3 provides:

> In dealing on behalf of a client with a person who is not
> represented by counsel, a lawyer shall not state or imply
> that the lawyer is disinterested. When the lawyer knows
> or reasonably should know that the unrepresented person
> misunderstands the lawyer's role in the matter, the
> lawyer shall make reasonable efforts to correct the
> misunderstanding. The lawyer shall not give legal advice
> to an unrepresented person, other than the advice to
> secure counsel, if the lawyer knows or reasonably should
> know that the interests of such a person are to have a
> reasonable possibility of being in conflict with the
> interests of the client.

The circuit court found that Wise never told her or "intimated that he was representing Audrey's interests." Moreover, the circuit court found Bettman's comments regarding his "experience with such matters" and that his attorney was Ken Gosch made Wise believe that "Bettman was advising Audrey and that legal counsel was available to her through her brother." Wise "did not [know] or reasonably should [have known]" that Audrey believed he represented her. Moreover, Audrey never expressed any doubts about the agreement or asked any questions. Audrey maintained she wanted to carry out her dying husband's wishes, which could have led Wise to believe that Audrey's and Ronald's interests were in line, not in conflict. While Wise could have specifically informed Audrey that he only represented Ronald, thereby eliminating any doubts, there is no evidence he violated the rule or that Audrey was the victim of constructive fraud.[12]

***Undue influence***

[¶33.]        SDCL 53-4-7 provides that:

Undue influence consists:

(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; or
(2) In taking an unfair advantage of another's weakness of mind; or
(3) In taking a grossly oppressive and unfair advantage of another's necessities or distress.

---

12.    Attorney Wise did not issue an engagement letter with a copy to Audrey that he only represented Ronald, or place such an acknowledgement in the trust agreement. Either may have eliminated the question, cost and expense of this appeal.

Audrey has the burden

> To prove each of the four elements of undue influence by the greater weight of the evidence. These elements include:
>
> (1) [her] susceptibility to undue influence;
> (2) opportunity to exert such influence and effect the wrongful purpose;
> (3) a disposition to do so for an improper purpose; and
> (4) a result clearly showing the effects of undue influence.

*In re* Estate of Schnell, 2004 SD 80, ¶21, 683 NW2d 415, 421 (additional citations omitted).

[¶34.] Audrey has not met her burden of demonstrating undue influence. First, there is no testimony that Audrey was susceptible to undue influence. She testified she was under stress due to her husband's impending death, but the circuit court specifically found that she was not suffering from any weakness of mind, that she was cool, calm and collected during the entire trust planning and knew and understood what was asked of her. Moreover, there is no testimony Ronald had a disposition to exert undue influence over Audrey for an improper purpose, or had an opportunity to exert undue influence, especially considering he was so weak that he needed Audrey's help signing the documents.

[¶35.] Additionally, there is not a result that clearly shows the effects of undue influence. Audrey was allowed to live in the home for as long as she liked as long as she paid for insurance, taxes and upkeep. This is the same obligations she would have prior to Ron's death. Furthermore, this home was purchased with the

inheritance from Ronald's first wife.[13] There is no wrongful purpose in wanting

your children to receive ownership to a home which was purchased by their mother,

nor is this a result that clearly shows the effects of undue influence.[14] Audrey has

not demonstrated that the circuit court erred in ruling there was no undue

influence.

*Mistake*

[¶36.]        Audrey's final claim under this issue is that the agreement is voidable

or otherwise subject to rescission because of mistake. SDCL 53-4-10 provides that:

> A mistake of law in relation to consent to contract
> constitutes a mistake resulting in voidable consent only
> when it arises from:
>
> (1) A misapprehension of the law by all parties, all
> supposing that they knew and understood it and all
> making substantially the same mistake as to the law; or
> (2) A misapprehension of the law by one party of which
> the others are aware at the time of contracting, but which
> they do not rectify.

[¶37.]        Audrey argues that she did not know the facts and law surrounding

the waiver of her surviving spouse rights; therefore, the agreement is voidable

and/or should be rescinded. As the trial court noted, Audrey does not argue that all

parties misapprehended the law or knew she misapprehended the law and failed to

---

13.   *See also* note 5, *supra*.

14.   Indeed, as Dale points out in his brief, the drafters of the Uniform Probate
      Code recognized that parties in second marriages may choose the same result
      as Ronald. Comments to the code recognized the "common and commendable
      desire of parties to second and later marriages to insure that property
      derived from prior spouses passes at death to the issue of the prior spouses
      instead of to the newly acquired spouse." Unif Probate Code 2-204, 8 ULA
      338 (1972).

rectify her misapprehension. She argues that she alone did not understand or know the law. Therefore, her lack of knowledge does not constitute a mistake of law.

> Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
>
> (1) An unconscious ignorance or forgetfulness of a fact, past or present, material to the contract; or
>
> (2) Belief in the present existence of a thing material to the contract which does not exist, or in the past existence of such a thing which has not existed.

SDCL 53-4-9. Audrey alleges that her lack of knowledge of Ronald's financial holdings constitutes a mistake of fact. However, the circuit court found Audrey ascertained the state of Ronald's financial holdings when Wise went through the financial documents she provided in her presence. Given the record, this finding is not clearly erroneous and will not be disturbed on appeal.

[¶38.]        Finally, as noted above, "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party." *Holzer*, 2000 SD 65, ¶28, 610 NW2d at 795 (additional citations omitted). Wise testified Audrey did not ask any questions regarding the waiver of her statutory surviving spouse rights. Nor did Audrey seek the advice of an attorney, despite having five days between meeting with Wise and signing the waiver. When presented with the documents for her signature, again Audrey did not seek the advice of an attorney or request time to do so. "[I]gnorance of the contents of a written contract is not a ground for relief from liability." Wiley v. Iverson, 985 P2d 1176, 1181 (Mont 1999) (additional citations omitted). "To permit a party, when sued on a written contract,

to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." LPN Trust v. Farrar Outdoor Advertising, Inc., 1996 SD 97, ¶13, 552 NW2d 796, 799 (quoting 17A AmJur2d Contracts §§ 224-228 (1991)). Moreover, the Eighth Circuit Court of Appeals, when interpreting South Dakota law, has refused to rescind a contract on the basis of mistake when that mistake was caused by failing to understand the terms of a contract before signing it. *See* First Colony Life Ins. Co. v. Berube, 130 F3d 827, 829 (8thCir 1997) ("[Plaintiff] is not entitled to rescission for mistake, because his mistake was caused by the neglect of a legal duty, which extended to making sure he understood the contents of the contract before he signed it.") (citing SDCL 53-4-9; Sutherland v. Sutherland, 187 Kan 599, 358 P2d 776, 785 (1961) (duty to read and obtain explanation of contract contents); Beatty v. Depue, 78 SD 395, 103 NW2d 187, 191 (1960) (mistake must not result from want of ordinary care and diligence exercised by reasonable person)). Audrey has failed to demonstrate fraud, misrepresentation or other wrongful acts existed and she should be held to the terms of the contract. Thus, the trust agreement is not voidable or subject to rescission and her waiver should be enforced.

[¶39.] Audrey failed to meet her burden of demonstrating that the trial court erred when it held the waiver was valid and the agreement was enforceable. For all the foregoing reasons, we affirm.

[¶40.] GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶41.]		KONENKAMP, Justice, dissents.


KONENKAMP, Justice (dissenting).

[¶42.]		During the oral argument in this appeal, one of the lawyers asserted that the same rules courts apply to commercial contracts should also apply to marital agreements. Today, the Court embraces this bleak and mercantile view of marriage. Indeed, to support its decision on voluntariness, the Court cites all commercial cases as authority. It is true that courts have often said that marriages are contractual in nature, but the many complementary rights, duties, and remedies of married couples are also governed by statute and precedent, wholly apart from the general rules of contract. We have held, again and again, that the state of marriage is one of mutual confidence and trust. In this Court's stark analysis, however, our authorities confirming marriage as a protected institution of undisputed social value barely receive consideration.

[¶43.]		Relationships between husbands and wives cannot be likened unto commercial transactions among operatives who deal at arms length. *See In re Estate of Gab*, 364 NW2d 924, 925 (SD 1985); Keith v. Keith, 37 SD 132, 156 NW 910, 911 (1916). Indeed, numerous courts have described the marital relationship as fiduciary. *See* Smith v. Smith, 860 P2d 634, 643 (Idaho 1993); Williams v. Waldman, 836 P2d 614, 618 (Nev 1992); Sidden v. Mailman, 563 SE2d 55, 58 (NCCtApp 2002); Tiryakian v. Tiryakian, 370 SE2d 852, 854 (NCCtApp 1988); *In re Estate of Lutz*, 563 NW2d 90, 98 (ND 1997); Cohen v. Estate of Cohen, 491 NE2d 698, 699 (Ohio 1986); Miller v. Ludeman, 150 SW3d 592, 597 (TexCtApp 2004). We

also have held that the relationship is fiduciary. *Gab*, 364 NW2d at 925 (confidential relationship). Until today, our law on marital agreements prohibited spouses in South Dakota from treating "each other as strangers at arm's length." *Id*. at 926. As the North Dakota Supreme Court recognized, "Ordinarily, business transactions between a husband and wife will be deemed to be within the rule of confidential relations[.]" Barker v. Barker, 27 NW2d 576, 581 (ND 1947).[15]

[¶44.]      Here, the central question is whether Audrey Smid *voluntarily* signed a document in which she waived and renounced "any and all rights of homestead, surviving spouse award, surviving spouse right of election, exemption, family allowance, inheritance, descent, or other marital right arising by virtue of statute or otherwise" in her home. Under SDCL 29A-2-213(b)(1), a surviving spouse's waiver is not enforceable unless it is executed voluntarily. The statute provides no definition of the word "voluntary." It is left to us to define. We should consider the term in the light of South Dakota's protective policy regarding marriage.[16] In that

---

15.   The Court concludes that Audrey waived any claim that marriages are fiduciary relationships because she failed to raise the issue. Concededly, this is our standard policy: failure to argue a point waives it on appeal. There are limitations to this rule, however. The existence of a fiduciary relationship is a pure question of law. Ward v. Lange, 1996 SD 113, ¶12, 553 NW2d 246, 250. That marriage is a fiduciary relationship is beyond any dispute. To not take this into consideration risks a miscarriage of justice. *See* Childers and Davis, *Federal Standards of Review* § 6.03 (3d ed 1999) (questions of law may be decided *sua sponte* especially if risk of miscarriage of justice).

16.   In addition to our more than century-long precedent, our code of laws also protects the institution of marriage. *See, e.g.,* SDCL 25-7-1 (duty to support spouse); SDCL 20-9-7 (prohibiting abduction, enticement, or seduction of spouse); SDCL Title 29 (protection of spousal inheritance rights); SDCL 53-8-2 (2) (agreement made on consideration of marriage); SDCL 43-3-4

(continued . . .)

light, "voluntary" takes on a fuller meaning than the merely commercial one given by the Court.

[¶45.]    By this Court's reckoning, "voluntary" is relegated to nothing more than whether the spouse was "forced to sign the waiver." This is the same primitive standard the circuit court used. Whether force was used may be the beginning of a voluntariness analysis, but it hardly disposes of the question. In accord with this standard, however, the Court quotes with approval a commercial contract principle: "'one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party.'" *See* Holzer v. Dakota Speedway, Inc., 2000 SD 65, ¶28, 610 NW2d 787, 795 (citation omitted). The cases the Court offers to support its holding, *Holzer*, concerning an assumption of risk waiver signed by a racecar pit crew member, and *LPN Trust v. Farrar Outdoor Adv. Inc.,* 1996 SD 97, ¶13, 552 NW2d 796, 799, a roadside billboard contract case, have nothing to do with marital relationships.

[¶46.]    Regrettably, the Court's decision puts us in the extreme minority who equate postnuptial agreements with business contracts. Most other courts take a far more insightful view of such agreements. In the case of *In re Marriage of Bonds*, for example, the court engaged in an extensive analysis distinguishing premarital

---

(. . . continued)

(forbidding restraints on marriage); SDCL 36-33-29 (protecting marital confidentiality in therapy sessions); SDCL 25-8-57 (presumptive legitimacy of child born during marriage); SDCL 53-9-7 (voiding contracts in restraint of marriage); SDCL 19-13-12 (Rule 504(a)) (confidentiality of communication between husband and wife).

agreements from commercial contracts. 5 P3d 815, 829 (Cal 2000), *superseded by statute on different grounds*, Li v. Tzortzatos, 2006 WL 3096066 (CalCtApp). In rejecting the idea that the two should be considered alike, the court observed: "considerations applicable in commercial contexts do not necessarily govern the determination whether a premarital agreement was entered into voluntarily." *Id.* And, the court explained, "the reference to voluntariness in the Uniform [Premarital Agreement] Act was intended to convey an element of *knowing waiver* that is not a consistent feature of commercial contract enforcement." *Id.* at 830 (emphasis added).[17]

[¶47.] Several courts have examined the concept of voluntariness in the context of waivers in premarital and postnuptial agreements. From those cases, it is evident that several key elements are routinely considered. Those elements include: the bargaining power of the parties; whether there was coercion; the timing of the waiver and the impending event; the presence of independent counsel for the waiving party; and the party's knowledge of the terms, purpose, and effect of the agreement.[18] Independent legal advice prevails as an important factor in most

---

17. Although this writing is limited to postnuptial (marital) agreements under South Dakota's Uniform Probate Code, in keeping with most authorities, no distinction is made here between premarital and postnuptial (marital) agreements. None is made in our version of the Uniform Probate Code, SDCL Title 29A, and neither is one made in the Restatement (Third) of Property, *Wills & Other Donative Transfers* § 9.4, *Premarital Or Marital Agreement.* A distinction, however, not relevant here, is that some courts have held that parties to a prenuptial agreement, who, of course, are not yet married, are not presumed to share a confidential relationship.

18. *Bonds,* 5 P3d at 826-27; McHugh v. McHugh, 436 A2d 8, 11-12 (Conn 1980); *In re* Marriage of Spiegel, 553 NW2d 309, 315 (Iowa 1996); *Tiryakian,* 370

(continued . . .)

decisions.[19] *Bonds*, 5 P3d at 826-27; *Lutz*, 563 NW2d at 97-98; Kahn v. Kahn, 756 SW2d 685, 695 (Tenn 1988); *In re* Marriage of Matson, 730 P2d 668, 671 (Wash 1986); Button v. Button, 388 NW2d 546, 551 (Wis 1986).

[¶48.] Based on these authorities, and considering South Dakota's strong support for the institution of marriage, on the question of voluntariness of the person against whom a postnuptial (marital) agreement is sought to be enforced, a court should examine:

1. Equality or inequality of bargaining power and sophistication between the parties;

2. Proximity of the impending event (i.e., death, etc.) to the time of execution, with extremely short times closely scrutinized;

---

(. . . continued)
SE2d at 854; *Lutz*, 563 NW2d at 97-98; *In re* Marriage of Matson, 730 P2d 668, 671 (Wash 1986); Button v. Button, 388 NW2d 546, 550-52 (Wis 1986).

19. With respect to premarital agreements, the North Dakota Supreme Court summarized the state of the law in this country on the question of legal representation for the party against whom enforcement is sought.

> No state makes independent counsel an absolute requirement for validity. Randolph v. Randolph, 937 SW2d 815, 822 (Tenn 1996). Some states require at least an opportunity to consult with independent counsel, but do not require actual consultation. McKee-Johnson v. Johnson, 444 NW2d 259, 266 (Minn 1989)[, *overruled by, In re* Estate of Kinney, 733 NW2d 118 (Minn 2007)]; Gant v. Gant, 329 SE2d 106, 116 (WVa 1985). Many states, however, treat the absence or presence of independent legal counsel as a factual factor in assessing the voluntariness of a premarital agreement. *Ex Parte* Walters, 580 So2d 1352, 1354 (Ala 1991); McHugh v. McHugh, 436 A2d 8, 12 (Conn 1980); *In re* Benker's Estate, 331 NW2d 193, 199-200 (Mich 1982); Fletcher v. Fletcher, 628 NE2d 1343, 1348 (Ohio 1994); *Randolph* [v. Randolph], 937 SW2d[ 815,] 822; *In re* Marriage of Matson, 730 P2d 668, 671 (Wash 1986); Button v. Button, 388 NW2d 546, 550-51 (Wis 1986)[.]

*Lutz*, 563 NW2d at 97.

3. Advice of independent counsel at the time of signing the agreement, or express waiver of independent legal advice; and

4. If unrepresented, such person's knowledge and understanding of the rights being given up, and an understanding of the true effect of the agreement.

These should be considered together, with no single element being dispositive. It would seem obvious, but still worth emphasizing, that as a matter of fundamental fairness, no spouse in South Dakota should forfeit his or her inheritance rights without these basic considerations. In light of these elements, let us now consider the facts of our case.

### 1. Inequality of Bargaining Power.

[¶49.]     There is nothing in the record on whether Audrey possessed any legal or business sophistication. Nor is there any finding by the circuit court that "consideration" was given for the waiver. Nonetheless, this Court composes its own findings of fact, writing in its opinion that there was adequate "consideration" for Audrey's waiver of rights.[20]

### 2. Proximity of Agreement Execution to Impending Event.

[¶50.]     Here is one of the most troubling aspects of this case. It was obvious that Ronald's death was imminent, and he had only decided, at the behest of his

---

20. It is distressing that the Court can, on the one hand, insist that Audrey "waived" the benefit of marriage as a fiduciary relationship, an undisputed principle of law, and, on the other hand, bolster the Trustee's position by entering appellate fact findings helpful to his case.

son, to proceed with an estate plan at the eleventh hour.[21] The timing could not have been more problematic. Audrey first saw and signed the trust agreement, as did her dying husband, on the afternoon of January 29, 2003. Ronald died early the next morning. With respect to Audrey, the agreement stated:

> The settlor's wife (Audrey Smid) by executing this Agreement and by executing and delivering the Warranty deed, on behalf of herself, her heirs, legal representatives and assigns, waives and renounces any and all rights of homestead, surviving spouse award, surviving spouse right of election, exemption, family allowance, inheritance, descent, or other marital right arising by virtue of statute or otherwise, in and to the real property.

She had little time to discuss it with anyone, much less to ponder the document as it might affect her. As will be more fully discussed below, no one explained the meaning of these legal terms to her. It is true that Audrey heard Ronald's lawyer discuss the purpose for creating a trust agreement a few days earlier, on January 24. But nothing prepared her for this legal waiver language.

[¶51.] Again, it must be underscored that Audrey first saw the technical waiver language in the agreement when it was presented to her as Ronald was dying, twelve hours before he expired.[22] Yet, in keeping with its commercial model for marital agreements, the Court affirms the circuit judge's rationale that Audrey chose "not to consult with an attorney before signing" the agreement. Obviously, it

---

21. *Cf*. Lutgert v. Lutgert, 338 So2d 1111, 1113-16 (FlaCtApp 1976) (antenuptial agreement invalid -- presented within twenty-four hours of wedding, with passage booked on European cruise).

22. In the case of premarital agreements, some jurisdictions require grace periods before the agreements can be valid. *See, e.g.*, 13 Dela Code 1974 § 301 (10-day waiting period).

would have been in her legal interests to have seen a lawyer, but to fault her for choosing to stay at her husband's deathbed instead of leaving him to consult a lawyer imposes an unfair burden on Audrey. Ronald's late decision put them in this position. It should not be held against Audrey that she chose dutifully to remain with her husband in his last moments.

### 3. Advice of Independent Counsel or Waiver of Counsel.

[¶52.] Presence of independent counsel is the best indicator that the disadvantaged party understood the effect of the agreement. *See Lutz*, 563 NW2d at 97-98. Although Attorney Wise never told Audrey that he was not her attorney, that he only represented Ronald, and that he could protect only Ronald's interests, the circuit court found nonetheless that Audrey knew Wise was not representing her.[23] Yet the point cannot be overstated that Attorney Wise never advised her that she should seek her own legal counsel. In addition to no warning from Ronald's attorney, no language in the agreement itself warned Audrey that she could or should seek legal advice. Nothing in the record establishes that Audrey knew what

her options were as a wife, much less as an impending widow. Everything in those waning hours of Ronald's life was oriented toward what Ronald wanted. As Attorney Wise explained, "Audrey's claims were not my concern. My client's wishes were my concern. And to the extent that she waived those rights, my client's wishes were fulfilled."

### 4. Understanding of Rights and Effect of Agreement.

[¶53.]    This element comprises two separate questions:  understanding the rights one has in forming an agreement, and understanding the practical effect of the agreement.  Taking the second question first, the effect of the agreement, the facts as the circuit court found are fairly dispositive on this point.  Audrey knew the purpose of the agreement was to transfer the home to Ronald's children.  She knew that she would be able to live in the home during her lifetime.  Indeed, she wanted to help Ronald fulfill his intentions in this regard.

[¶54.]    What she did not know, however, was what her legal rights were in the matter.  Audrey was never told that Ronald's interests could potentially conflict with hers.  As the circuit court found, Attorney Wise "did not discuss with Audrey any of her statutory rights as surviving spouse."  The Court glosses over this point by declaring that Audrey knew she was waiving "certain" rights.  But Audrey was never advised about the meaning of these "certain" rights, or how she could assert those rights.  Even the circuit judge conceded, "There is no dispute that Audrey was never informed of her statutory rights as a surviving spouse."

### Conclusion

[¶55.]    On the whole, these factors weigh against enforcing the agreement.  The circuit court's decision otherwise was both clearly erroneous and legal error.  Audrey had no legal advice and no warning that she should obtain legal advice.  The

_____

(. . . continued)

23.    In this writing, no inquiry is directed at Attorney Wise.  The issue is the enforceability of the postnuptial agreement, and not the extent of counsel's duty to an unrepresented party to the agreement.

document waiving her inheritance rights was placed before her only hours before her husband died. And at no time did anyone explain to her the legalistic waiver language that eliminated all her statutory rights.

[¶56.] It is not enough to declare, as this Court does, that considering her short-lived marriage and other circumstances, Audrey got what was coming to her. Our analysis cannot be controlled by the outcome. The rules we uphold today may well bind or loose many other marital arrangements. Those rules should be fairly and clearly delineated for the unique relationship marriage constitutes in our law. When husbands or wives wish to make distributions of marital assets, distributions that exclude their spouses, and especially deathbed distributions, the haste and anguish of the moment may deprive surviving spouses of an opportunity to preserve their rights. Today's decision fails to recognize the critical interests at stake in protecting surviving spouses like Audrey in the difficult circumstances of making marital agreements on the eve of a pending death.